## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### Tampa Division

**MICHAEL T. FLYNN**,
an individual,

**Plaintiff**

v.

**UNITED STATES OF AMERICA**,
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001,

**Defendant.**

Case No.: _____

**COMPLAINT**

 

1. On May 7, 2020, the United States Department of Justice ("DOJ") moved to dismiss the criminal information that had been filed on November 30, 2017, against Plaintiff Lt. Gen. Michael T. Flynn, U.S. Army, Retired ("General Flynn"), charging him with one count of willfully and knowingly making false, fictitious, and fraudulent statements in a matter within the jurisdiction of the executive branch of the government of the United States. In this motion, the DOJ admitted, through Timothy Shea, then United States Attorney for the District of Columbia, that:

> The Government is not persuaded that the January 24, 2017 interview was conducted with a legitimate investigative basis and therefore does not believe Mr. Flynn's statements were material even if untrue. Moreover, we [sic] not believe that the Government

can prove either the relevant false statements or their materiality beyond a reasonable doubt.

2.     The DOJ therefore admitted that they should never have brought this prosecution against General Flynn because the interview that formed the basis of the criminal information should never have happened and, even though it did happen, it was not a proper basis for the felony charge.

3.     Of particular relevance, the DOJ, the Federal Bureau of Investigation ("FBI"), and the Office of the Special Counsel ("SCO") personnel knew or should have known of the lack of basis for the investigation, interview, and charge before the criminal information was ever filed. Therefore, agents and agencies of the United States of America, utilized their official positions and offices to initiate a baseless investigation, keep that investigation open, undertake illegitimate investigative steps, and bring unjustified criminal charges to maliciously prosecute General Flynn.

4.     This lawsuit seeks accountability and damages against the United States for these wrongs committed against General Flynn through its agents and agencies. Specifically, General Flynn seeks relief herein for Defendant's agents and agencies' violations of his constitutional and other legal rights in connection with this wrongful and malicious prosecution and gross abuse of process.

5. Defendant improperly and politically targeted General Flynn because of his lawful association with the 2016 Presidential campaign of Donald J. Trump and his position as National Security Advisor in the Trump Administration. General Flynn is entitled to relief for Defendant's unjustified and illegal actions, including but not limited to malicious prosecution and abuse of process.

6. The official misconduct occurred in connection with FBI investigations Crossfire Hurricane and Crossfire Razor, both fraught with egregious legal and ethical misconduct admitted by DOJ, lacked investigative predicate, and part and parcel to the unfounded criminal information brought against General Flynn by the SCO on behalf of the DOJ.

7. The FBI Crossfire investigations and the DOJ and SCO criminal case against General Flynn were brought without probable cause, based on deficient information, and caused substantial and irreparable harm to General Flynn. Defendant's conduct, which began not later than August 2016 and continued until at least December 2020, constituted violations of General Flynn's constitutional and other rights.

8. These devastating damages, not just to General Flynn personally, but to the reputation and public trust of the FBI, were forewarned. On the fateful day of January 24, 2017, when the FBI was to dispatch counterintelligence agents to interview General Flynn, Assistant Deputy

Director E.W. ("Bill") Priestap had second thoughts. He asked whether their goal was to get to the truth, or to "get [Flynn] to lie, so we can prosecute him or get him fired?" He ominously wrote: "Protect our institution by not playing games." What followed has been the fall of a once-venerable institution. The only way back to public trust, and for justice to be done for General Flynn, is to hold accountable the United States, whose agents and agencies ignored their statutory and constitutional duties.

## **PARTIES**

9.     Plaintiff Lt. Gen. Michael T. Flynn, U.S. Army, Retired, is an individual who is a resident and citizen of the State of Florida. At the time of the events and allegations in this Complaint, General Flynn was director of the Defense Intelligence Agency in the Obama Administration and then the U.S. National Security Advisor in the Trump Administration.

10.     Defendant United States of America includes all government agencies and departments responsible for the wrongful acts of its employees acting within the scope or office of their employment while investigating and bringing false allegations of Gen. Flynn, and is sued under 28 U.S.C. § 1346 and 5 U.S.C. §§ 702–703.

## **WRONGDOERS ON BEHALF OF THE UNITED STATES**

11.    The United States Department of Justice is an executive department of the United States with its headquarters office at 950 Pennsylvania Avenue, N.W., Washington, D.C. 20530, including its Office of Inspector General ("DOJ OIG"). References to any actions taken by the DOJ or the DOJ OIG in this Complaint encompass their officials, appointees, employees, agents, and/or contractors, both known and unknown to Plaintiff.

12.    The Federal Bureau of Investigations is the investigative agency for the DOJ with its headquarters office at 935 Pennsylvania Avenue, N.W., Washington, D.C. 20535. References to any actions taken by the FBI in this Complaint encompass its officials, appointees, employees, agents, and/or contractors, both known and unknown to Plaintiff.

13.    The Special Counsel's Office is an investigative and prosecutorial office of the DOJ which at the time of the events and allegations in this Complaint had its headquarters office at 950 Pennsylvania Avenue N.W., Room B-103, Washington, D.C. 20530. References to any actions taken by the SCO in this Complaint encompass its officials, appointees, employees, agents, and/or contractors, both known and unknown to Plaintiff.

14.    The Executive Office of the President ("EOP") is an agency within the White House that has its headquarters office at 1600 Pennsylvania Avenue N.W., Washington, D.C. 20500. References to any actions taken by the EOP in

this Complaint encompass its officials, appointees, employees, agents, and/or contractors, both known and unknown to Plaintiff.

15.    James Comey was the Director of the FBI from September 2013 to May 2017. Comey verified under penalty of perjury three false FISA warrant affidavits, participated in and approved the initiation and continuation of the investigation into General Flynn, as well as the decision to send agents to interview General Flynn without notice to White House counsel, and assisted in the decision to prosecute General Flynn without proper basis or probable cause. The President of the United States dismissed Mr. Comey on May 9, 2017.

16.    Andrew McCabe was the Deputy Director of the FBI from February 2016 to January 2018. He was an original and primary participant in the Crossfire Hurricane investigation. McCabe was the FBI's lead signatory of the final FISA renewal affidavit in June 2017, and was a key participant in the initiation and continuation of the investigation into General Flynn, as well as the decision to send agents to interview General Flynn without notice to White House counsel.

17.    Peter Strzok was a career FBI agent until August 2018 and served as Deputy Assistant Director of Counterintelligence. He supervised the investigation of General Flynn and was involved in the decision to start the investigation, continue the investigation, and initiate the prosecution of

General Flynn. The FBI dismissed Strzok stating "your repeated selfishness has called into question the credibility of the entire FBI." *See* Exhibit A.

18.     Lisa Page is a former attorney at the FBI.

19.     Joe Pientka, III, during the relevant period, served as a Supervisory Special Agent of a Foreign Counterintelligence Squad at the FBI's Washington Field Office.

20.     Robert S. Mueller, III, was the Special Counsel in charge of the Special Counsel's Office responsible for the prosecution of General Flynn. He was also the Special Counsel appointed to lead the SCO's continuation of the Crossfire Hurricane and attendant investigations, including the Crossfire Razor investigation. He is responsible for overseeing and approving the filing of the criminal information against General Flynn.

21.     Brandon Van Grack was Senior Assistant Special Counsel in the SCO and is responsible for filing the criminal information against General Flynn.

## JURISDICTION AND VENUE

22.     This Court has original subject matter jurisdiction over General Flynn's federal claims under 28 U.S.C. §§ 1331 and 1346(b)(1) because they arise under federal law and because the United States is a defendant.

23.     This Court has personal jurisdiction over the federal government defendant pursuant to 28 U.S.C. § 1346(b)(1).

24.     This Court is the proper venue pursuant to 28 U.S.C. § 1402(b) as Plaintiff resides within this judicial district.

## FACTUAL BACKGROUND
### History of General Flynn

25.     In 1981, General Flynn was commissioned as a second lieutenant in military intelligence in the United States Army. From 1981 until September 30, 2014, General Flynn honorably served his country in a variety of posts.

26.     On April 17, 2012, President Barack Obama nominated General Flynn as the Director of the Defense Intelligence Agency ("DIA") and the United States Senate subsequently confirmed that appointment. In this role, General Flynn was responsible for overseeing the DIA's mission to provide military intelligence to warfighters, defense policymakers, and force planners in the Department of Defense and the United States' broader Intelligence Community in support of United States military planning and operations and weapon systems acquisition.

27.     General Flynn served as DIA Director until stepping down from that role on August 7, 2014, and subsequently retiring from the Army on September 30, 2014. Admiral Mike Rogers, then President Obama's director of the NSA, praised General Flynn as "the best intelligence officer of the past 20 years." Following his retirement, General Flynn opened a successful international consulting business that he operated with his son, Michael

Flynn, Jr. In 2016, General Flynn began consulting for several of the Republican candidates for president.

28.     In or around February 2016, General Flynn became a foreign policy advisor to then-Republican presidential candidate Donald J. Trump. General Flynn continued to serve in this role through the election and on the transition team when it was announced that he would be incoming President Trump's selection for National Security Advisor ("NSA").

### FBI Opens Crossfire Hurricane Investigation of <u>Donald J. Trump without Legitimate Investigative Predicate</u>

29.     On July 31, 2016, the FBI, under the direction and supervision of Comey, McCabe, Priestap, and Strzok, opened a counterintelligence investigation named Operation Crossfire Hurricane, putatively concerning the Foreign Agent Registration Act ("FARA"), to determine whether "individual(s) associated with the Trump campaign are witting of and/or coordinating activities with the Government of Russia."

30.     According to the FBI, the basis for opening this investigation was a tip from Andrew Downer, an Australian diplomat, who recalled a months-prior conversation with George Papadopolous in a bar. As Downer recalled, Papadopolous had said something about being told by someone else that Russia had information damaging to Hillary Clinton and would be willing to release it during the campaign to damage Clinton. Purportedly based on this vague

hearsay within hearsay—and the fact that, two months after that alleged barroom conversation, WikiLeaks released emails hacked from the Democratic National Committee ("DNC") that showed the DNC's preference for Clinton over her primary opponent Bernie Sanders—the FBI opened one of the most consequential investigations in its history.

31.   On or about August 15, 2016, Strzok and Page exchanged text messages about then-Republican presidential candidate Donald J. Trump, explicitly stating that they needed to have an "insurance policy" in case he won the election. *See* Exhibit B.

32.   Subsequently, on or about August 16, 2016, the FBI opened a sub-investigation specifically into General Flynn as part of the Crossfire Hurricane investigation named "Crossfire Razor." The purported purpose of the investigation was to determine if General Flynn knowingly or unknowingly was "involved in activity on behalf of the Russian Federation which may constitute a federal crime or threat to national security." *See* Exhibit C. As discussed below, Crossfire Razor also had no legitimate investigative predicate, and was politically and maliciously initiated as part of the "insurance policy" to derail and discredit then-presidential candidate Donald J. Trump.

33.   As part of the Crossfire Hurricane investigation, the FBI and the DOJ worked to obtain search warrants from the Foreign Intelligence

Surveillance Court ("FISC") to investigate the actions of persons in the Trump presidential campaign.

34.   According to the DOJ OIG, the FBI was originally told they did not have probable cause to lawfully obtain a Foreign Intelligence Surveillance Act ("FISA") warrant by DOJ.

35.   In September 2016, the FBI and DOJ received information from Christopher Steele, a Confidential Human Source ("CHS"). As the Crossfire Hurricane team knew, Steele had been paid by the national Democratic Party and/or the Hillary Clinton Democratic presidential campaign to perform political opposition research and dig up dirt on any connections between the Trump Republican presidential campaign and Russia to damage President Trump's campaign and divert attention from the investigation of Clinton's "extremely careless" email practices while she was Secretary of State.

36.   In addition to payment by democratic political operatives, Steele was also paid for his work by the FBI.

37.   The FBI was so intent on obtaining a FISA warrant to enable it to spy on the Trump campaign that it did not fully and accurately disclose to the FISC the evidence it had obtained as to whether any target of the probe was a Russian agent. To persuade the FISC that there was probable cause to believe that the investigation had merit, Defendant's agents and agencies provided

false or misleading information to the FISC to obtain approval for the first FISA warrant.

38.     The FBI did not advise the FISC that Steele had been paid by the national Democrat party and/or the Clinton presidential campaign to provide opposition research on Republican candidate Donald J. Trump and his campaign. The FBI also did not advise the FISC that Steele's primary sub-source contradicted critical information that Steele attributed to him. Instead, the FBI represented to the FISC that the primary sub-source was credible, without disclosing to the FISC that what the primary sub-source had *credibly* reported to the FBI was that the information Steele attributed to him was inaccurate and misleading.

39.     The four FISA warrants ultimately issued by the FISC were obtained unlawfully because there was no probable cause to seek them. The warrants were issued only because of the FBI's omissions and misrepresentations to the FISC.

40.     The DOG OIG report released in December 2019 established numerous material failures by the FBI to follow the Woods Procedures and other DOJ and FBI policies in obtaining the FISA warrants. Among other things, the FBI failed to verify the accuracy of the information included in the warrant applications. In many instances, the FBI either had no supporting documentation, misrepresented what the supporting documentation stated, or

the supporting documentation showed that the factual assertion made in the application was incorrect. Moreover, Michael Gaeta, the career FBI Agent assigned to handle Steele as a CHS, said that it was obvious Steele's work was politically motivated.

41.     Indeed, the DOJ temporarily held up an initial FISA warrant application because of the DOJ's concerns that Steele's bias may need to be disclosed to the FISC. Ultimately a footnote was added to the application, which stated:

> Source #1 [Steele], who now owns a foreign business/financial intelligence firm, was approached by an identified U.S. person, who indicated to Source #1 that a U.S.-based law firm had hired the identified U.S. person to conduct research regarding Candidate #1's ties to Russia (the identified U.S. person and Source #1 have a long-standing business relationship). The identified U.S. person hired Source #1 to conduct this research. The identified U.S. person never advised Source #1 as to the motivation behind the research into Candidate #1's ties to Russia. The FBI speculates that the identified U.S. person was likely looking for information that could be used to discredit Candidate #1's campaign.

42.     This misleading and virtually incomprehensible footnote ignores the fact that Steele was being paid with Democratic National Committee funds, which its law firm, Perkins Coie, funneled to Steele through the political opposition research firm Fusion GPS.

43.     The FBI knew that fully and accurately disclosing the motivations behind Steele's critical allegations on which it relied would undermine any finding of probable cause and would prevent it from obtaining a FISA warrant.

The FBI intentionally left out this information in the initial application for a FISA warrant submitted by the DOJ to the FISC on October 21, 2016. The same misleading information was used in the three subsequent FISA warrant applications.

44.     Without the FISA warrants, the Crossfire Hurricane investigation would likely have been closed in its entirety, and the prosecution of General Flynn likely would never have occurred.

### FBI Opens Crossfire Razor Investigation of General Flynn without Legitimate Investigative Predicate

45.     The Crossfire Razor investigation of General Flynn was a sub-investigation within the Crossfire Hurricane umbrella. Crossfire Razor stemmed from Crossfire Hurricane, contained many of the same personnel, and involved the same investigative strategy and issues.

46.     Leaving aside the lack of probable cause and other manifest deficiencies of the umbrella Crossfire Hurricane investigation, the Crossfire Razor sub-investigation itself lacked a legitimate investigative predicate. The FBI's reported justifications for opening Crossfire Razor were (i) General Flynn's position as advisor to presidential candidate Donald J. Trump, (ii) "open source" reporting on General Flynn's "ties to various state-affiliated entities of the Russian Federation," (iii) the fact that General Flynn traveled to Moscow where he famously sat at a table with Vladimir Putin, and (iv) that

General Flynn has a top secret/sensitive compartmented information ("TS/SCI") clearance. Exhibit C.

47.    Based on the FBI's draft closing communication, these purported justifications—in isolation and in combination—reveal the baseless and malicious nature of the investigation. Moreover, they were in violation of the FBI's own policies, which prohibit the investigation of a U.S. citizen solely for the purpose of monitoring activities protected by the First Amendment or the lawful exercise of other rights secured by the Constitution or laws of the United States, and require a factual investigative predicate.

48.    An FBI predicated investigation may be opened if a criminal action or threat to national security has or may have occurred, will be occurring, or is occurring, or if a target is or may be the object of an attack, victimization, acquisition, or recruitment in connection with such actions and the predicated investigation would protect against such threat. To open a preliminary predicated investigation, there must be an allegation of a violation of the above. Based on publicly available information, the FBI's apparent predicate is incredible.

49.    General Flynn's status as an advisor to a presidential candidate is not a proper justification to investigate him as a Russian spy. General Flynn is a widely respected three-star general, recognized as one of the United States' greatest intelligence officers. Unsurprisingly, he was sought out by and

advised multiple presidential candidates prior to joining the Trump campaign. Again, as discussed, there was no credible information to investigate Donald Trump as a Russian spy, so affiliation with President Trump—a First Amendment protected activity—was not a legitimate basis for investigation.

50. The supposed "ties" to "state-affiliated entities," apparently amounted to speaking fees that General Flynn received as part of his speaking circuit after leaving government service. As the FBI was well aware, speaking fees are common for high-level military personnel after they leave government service. General Flynn appeared at over two dozen events after leaving government service, all arranged by his speaking bureau, not by him personally, and all were lawful exercises of his First Amendment rights.

51. Among General Flynn's many speeches, given at corporate events for many companies, the supposed "ties" apparently amounted to three appearances. One was at a U.S.-based subsidiary of a Russian company. Another was at a U.S. company that happened to be owned by a Russian. The third was his appearance on a panel at a RT gala in Russia, where he sat at a table with Russian President Vladimir Putin. The fact that a notable retired general was invited to speak at these events was not unusual, the fees received were not unusual, and there was nothing specific about any of these appearances or speeches that was improper. These "ties" could be found with

any number of retired, high-level government officials, and did not warrant investigating General Flynn as a Russian asset.

52.    General Flynn's attendance of the RT gala in Russia is even less of a basis for investigation than already discussed. As the FBI was fully aware—yet conscientiously omitted from its closing memo—General Flynn briefed the U.S. government before and after the RT trip. Therefore, General Flynn was acting as an information-gathering agent for the United States, not for Russia. The inclusion of this trip (twice) as a justification for investigating General Flynn as a Russian spy was facially incredible. Making it even more incredible, is the fact, known to the FBI, that Vladimir Putin did not actually sit with General Flynn for an extended period of time, instead appearing briefly to address the attendees, posing for photos, and leaving.

53.    General Flynn's possession of TS/SCI clearance, one of the highest levels of security clearance, was a reason *not* to suspect General Flynn as a Russian spy. TS/SCI clearance holders undergo rigorous background investigations and polygraph examinations. In other words, General Flynn's TS/SCI clearance meant that he had already been thoroughly vetted by the U.S. government and was subject to ongoing investigation and polygraph examination to maintain his clearance. The FBI was fully aware at the time of opening Crossfire Razor that General Flynn had undergone a complete background investigation in spring of 2015, which included a full scope

polygraph examination. The FBI's inclusion of General Flynn's TS/SCI clearance as a justification for investigating him was also facially incredible.

54.    Even in combination, these factors could not possibly have formed a proper factual predicate for investigation. It would require the FBI to fantasize that a three-star general had betrayed his country on the basis of a few thousand dollars in speaking fees—a bare fraction of what generals make on the speaking circuit—and his position as foreign policy advisor to presidential candidate Donald J. Trump. This was incredible.

55.    The real reason for Crossfire Razor was part of the "insurance policy" discussed by FBI agents Strzok and Page the day before Crossfire Razor was opened. Exhibit B.

## FBI Continues Crossfire Razor Even After Clearing General Flynn

56.    Even ignoring the previously discussed problems with opening the Crossfire Hurricane *and* Crossfire Razor investigations, and assuming for argument that these investigations could have been opened in good faith, the FBI wrongfully and maliciously chose to continue Crossfire Razor even after it had completed its investigation and cleared General Flynn of any improper ties to Russia.

57.    The Crossfire Razor investigation was slated to be closed in December of 2016 because the investigation found no derogatory information on General Flynn. Importantly, the draft of the FBI memorandum closing the

investigation found that no interview of General Flynn was required before the investigation was closed. Exhibit C.

58.   This closing memorandum described the specific goal and predication for the investigation and laid out the numerous searches of holdings and investigative steps that had, at each step, yielded no derogatory information.

59.   The closing communication stated that the FBI's Crossfire Razor investigation had failed to produce any information upon which to predicate further investigative efforts regarding General Flynn. And it noted that no interview of General Flynn was warranted before concluding that the FBI was closing the investigation. Exhibit C.

60.   The closing memorandum had not been implemented, however, as of January 4, 2017. At some point before that date, but after the closing memo had already been drafted, FBI senior staff became aware of phone calls between General Flynn and Russian Ambassador Kislyak. In fact, the FBI had, in their possession, transcripts of the relevant calls, and they knew or should have known that the phone calls were legitimate.

61.   Knowing that the counterintelligence investigation of General Flynn was slated to be closed, FBI leadership considered opening a new criminal investigation based solely on a potential violation of the Logan Act, 18 U.S.C. § 953. Discussions with the DOJ, however, resulted in the general

view that the Logan Act was not viable, and the FBI never opened an independent FBI criminal investigation. This is unsurprising, as the Logan Act is a relic of the John Adams administration, the dubious constitutionality of which has never been tested because it has never been successfully prosecuted. Therefore, FBI leadership determined to continue its Crossfire Razor counterintelligence investigation of General Flynn on the sole basis of the Kislyak calls.

62.     On January 4, 2017, FBI Deputy Assistant Director Strzok urgently reached out to another FBI agent, demanding to know if the Crossfire Razor investigation had been closed, as previously intended, and if not, ordering that it remain open. It had not been closed. Relieved, Strzok immediately relayed the news to Lisa Page, the Special Counsel to FBI Deputy Director Andrew McCabe, remarking that "our utter incompetence actually helps us" and calling it a "serendipitously" good development. Exhibit D at 5.

63.     The reason that Strzok was so relieved at this serendipitous incompetence, is that he knew there was no legitimate grounds for opening another investigation into General Flynn. The FBI cannot simply investigate an incoming NSA because he communicated with a foreign leader; it is common during the transition to a new administration. Moreover, Strzok, McCabe, the FBI, and the EOP were fully aware that Flynn's statements to Kislyak were perfectly appropriate diplomatic talks, which sought to—and apparently

succeeded in—persuading Russia not to take drastic retaliatory steps against the United States in response to President Obama's recent expulsion of Russian diplomats.

64. It is only because of Defendant's agents and agencies' malicious, partisan, and unethical intent to investigate their political opponents generally and to destroy General Flynn specifically that senior officials and political leadership of the FBI, DOJ, and EOP continued the Crossfire Razor investigation.

65. Strzok instructed agents to keep the investigation open at the behest of FBI leadership. Therefore, as of January 4, 2017, the FBI kept open its counterintelligence investigation into General Flynn based solely on his calls with Kislyak—the only new information to arise since the FBI's determination to close the case—calls which they knew to be legitimate.

## Defendant's Improper and Malicious Motivations for Investigating and Prosecuting General Flynn

66. On or about November 10, 2016, only two days after the presidential election, President-elect Trump met with President Obama in the Oval Office. During this meeting, President Obama singled out General Flynn—and only General Flynn—warning President-elect Trump against appointing him to any high-level national security positions. President Obama

made this statement despite himself having appointed General Flynn to the position of Director of the Defense Intelligence Agency in 2012.

67.     President-elect Trump ignored that advice. On or about November 18, 2016, General Flynn accepted the once-in-a-lifetime honor of becoming the next National Security Advisor.

68.     The Obama White House held special contempt for General Flynn. As the Associated Press reported, "Of all the [sic] Trump's choices, White House officials said it was the selection of Flynn that felt like the most devastating blow." NPR also reported, "Flynn clashed with President Barack Obama's White House about how the U.S. was waging its wars." General Flynn had publicly lambasted President Obama for not being aggressive enough with Iran, for lying to the American public, and for politicizing intelligence.

69.     Top brass at the FBI also had reason to resent General Flynn. In 2012, a decorated counterintelligence agent at the FBI filed an EEOC complaint for sexual discrimination and retaliation, which implicated Andrew McCabe. General Flynn, who had worked closely with this agent, wrote a letter vouching for her in 2014 and volunteered to be a witness for her case. The FBI fought to prevent General Flynn from being a witness in this EEOC case.

70.     These issues—while they provide background on Defendant's vindictiveness and would be grounds enough to establish the calculated malice directed at General Flynn in their wrongful prosecution and abuse of process—

are a side-show to the bigger, and truly despicable motivations at play in the U.S. Government's targeting of a U.S. citizen and decorated three-star general for destruction and disgrace.

71.    General Flynn was the only senior member of President Trump's incoming administration—not subject to Senate confirmation—with experience in the intelligence community: the same intelligence community that had colluded with Clinton Campaign operatives to create the Russia-collusion hoax; the same intelligence community that had been spying on the Trump campaign; the same intelligence community that intended to *continue* its spurious Crossfire Hurricane "investigation" into President Trump's supposed Russian collusion. General Flynn—who already had a reputation as a hands-on disruptor at DIA, who had publicly excoriated the politicization of the intelligence community, and who had made clear his desire to overhaul the national security structure and the "interagency process"—was a direct threat, not only to the self-interest of entrenched intelligence bureaucracies and the federal officials involved, but to exposing their prior and ongoing efforts to derail and discredit President Trump.

72.    Defendant's agents were acutely aware that General Flynn was one of few people in the Trump White House with the authority and the intelligence background to uncover and expose the Crossfire Hurricane debacle.

73.    The EOP, under President Obama, was so distraught by General Flynn's selection as NSA that they calculatingly, and with actual malice and corrupt motives, conspired to and did use the tremendous power of their positions in the Executive Office of the President (and their influence over the DOJ and FBI) to investigate, entrap, and prosecute General Flynn. Defendant's agents executed these actions knowingly, purposely, and in complete disregard of General Flynn's constitutional and other legal rights.

74.    To do this, the named FBI employees first had to prevent the closure of the Crossfire Razor investigation, which had already determined that General Flynn had no ties to Russia. As discussed, on January 4, 2017, the FBI, in coordination with the EOP, chose to extend the Crossfire Razor investigation on the pretext of the legitimate Kislyak calls.

75.    The next day, January 5, 2017, FBI Director Comey and FBI Deputy Director Andrew McCabe ("McCabe") met in the Oval Office with President Obama, Vice President Biden, Deputy Attorney General Sally Yates (then, the acting attorney general), CIA Director John Brennan, ODNI Director James Clapper, and National Security Advisor Susan Rice.

76.    During this meeting, the participants agreed to try to damage incoming President Trump and his new Administration, including by trying to prosecute General Flynn, to force General Flynn to resign as NSA, and cripple President Trump's ability to implement national security and foreign affairs

policy changes, and potentially turn General Flynn against President Trump. They also agreed to withhold this agreement from President-elect Trump's transition team.

77.    Withholding information about the Crossfire Hurricane investigation from the incoming administration was a paramount goal, as documented by Susan Rice in her infamous CYA memo about this meeting, which she wrote to herself on January 20, 2017: "President Obama said he wants to be sure that, as we engage with the incoming team, we are mindful to ascertain if there is *any reason that we cannot share information fully as it relates to Russia*" (emphasis added).

78.    Immediately after that meeting, President Obama asked that Sally Yates and James Comey stay back for a private meeting, in which Obama and Comey spoke knowingly about the Flynn-Kislyak calls, discussed the Logan Act, and indicated the President's special interest in General Flynn.

### Defendant Plans Perjury Trap for General Flynn

79.    Between the Oval Office meeting on January 5, 2017, and January 24, 2017, Comey and Yates met to discuss the General Flynn matter, and thereafter Comey and McCabe discussed and developed a specific plan to interview Flynn about alleged Russian influence.

80.    On or about January 10, 2017, another Oval Office meeting took place involving a discussion of the Crossfire Razor investigation and General

Flynn. According to notes taken by Strzok, during this meeting, the group agreed that General Flynn's actions were "legit." A common shorthand for legitimate.

81.    At or around that time, an unnamed "senior U.S. government official" feloniously leaked details about General Flynn's phone call with Kislyak to the Washington Post, which published about it on January 12, 2017.[1] In a follow-up piece, the Washington Post reported that *nine* officials "who were in senior positions at multiple agencies" spoke anonymously, and illegally, about the Kislyak calls. Information about the calls was also leaked to the New York Times, whose reporting confirmed that the FBI and the Obama administration were aware at the time of the legitimate nature of the communications:

> Obama officials asked the F.B.I. if a quid pro quo had been discussed on the call, and the answer came back no, according to one of the officials, who like others asked not to be named discussing delicate communications. The topic of sanctions came up, they were told, but there was no deal.[2]

82.    Despite the consensus that General Flynn's actions, including the Kislyak calls, were legitimate, Vice President Biden suggested a potential prosecution of General Flynn under the Logan Act. The DOJ, however,

---

[1] David Ignatius, *Why did Obama dawdle on Russia's hacking?*, WASHINGTON POST, Jan. 12, 2017.
[2] Peter Baker, *Flynn's Downfall Sprang From 'Eroding Level of Trust'*, THE NEW YORK TIMES, Feb. 14, 2017.

indicated in subsequent meetings that such a prosecution would be unlikely to succeed, especially since no prosecution has ever occurred pursuant to the Logan Act.

83.     This, however, did not stop the high-level leakers from suggesting this possibility to the media, who breathlessly repeated the potential for a Logan Act violation. Importantly, the FBI would later use these leaks, and the media's discussion of the Logan Act, as a justification for not putting the White House or DOJ on notice prior to sending agents to "interview" General Flynn.

84.     FBI Director Comey decided that the FBI would not notify the incoming Trump administration of the actual contents of the Flynn-Kislyak communications, despite possessing the transcripts. Deputy Attorney General Sally Yates and other senior DOJ officials, however, were of the opposite opinion and believed that the incoming administration should be notified.

85.     Comey's reasoning for not disclosing the information to the Trump administration changed several times to the chagrin of DOJ leadership. The Deputy Attorney General, Director of National Intelligence, and Director of the Central Intelligence Agency all agreed that the FBI should notify the Trump administration of what had actually been said on the calls.

86.     In the interim, Strzok and Page sought advice from an FBI attorney regarding a potential interview of General Flynn. On January 22, 2017, an FBI attorney emailed Strzok and Page to state that if the FBI would

usually tell the White House about the interview of someone such as General Flynn, then the FBI should do what the FBI would normally do.

87.    Per the internal discussions of the FBI leading up to the interview of General Flynn, however, they believed that any notification to the White House or DOJ leadership about the interview or its purpose would surely result in a denial of permission to conduct the interview. At the very least, it would result in General Flynn being accompanied by White House counsel. In either case, their goal would be thwarted.

88.    The apparent goal was to ambush General Flynn with a perjury trap to remove him as an obstacle to the continuing Crossfire Hurricane investigation and as a threat to their own jobs and the entrenched intelligence apparatus.

89.    At an FBI meeting held on the morning of January 24, 2017, FBI Assistant Director Bill Priestap expressed second thoughts about the perjury trap. In his hand-written (and heavily redacted) notes from that day, he describes having previously agreed with the plan to not show General Flynn [redacted, but likely, the transcripts of the Kislyak calls]. He asks, however, whether the FBI's goal in this case is to get the truth, or to "get [Flynn] to lie, so we can prosecute him or get him fired?" Priestap recognized the grave danger these kind of "games"—as he diplomatically calls them—posed to the credibility of the FBI as an institution. His warnings were ignored. Exhibit E.

28

90. By apparent happenstance, Sally Yates attempted to contact Comey that same day, January 24, 2017, to demand that the FBI notify the White House of the Kislyak communications. Perhaps unsurprisingly, she was unable to get through. Comey waited until Strzok and Pientka were already en route to the White House before calling Yates back to tell her that it was too late, advising her that FBI agents were already on their way to interview General Flynn.

91. Yates was flabbergasted and dumbfounded by Comey's actions, and other DOJ leadership hit the roof upon hearing of this development, as any interview of General Flynn should have been coordinated with at least the DOJ and the White House Counsel's Office.

92. Comey had determined that the FBI would interview General Flynn without notifying anyone at either the DOJ or the White House Counsel's Office. During a December 2018 publicly televised interview with MSNBC and NBC News analyst Nicolle Wallace, Comey glibly admitted— indeed, bragged—that sending FBI agents to the White House to interrogate a senior official without notice, was something he probably wouldn't have done or gotten away with in a more organized administration. Comey admitted that he took an improper course of conduct in continuing the investigation and allowing the interview of General Flynn, and that he got away with it because it was "early enough" in the administration that he could take advantage of

the disorder. But for this interview of General Flynn, there would have been no criminal charges brought against General Flynn.

93.　On January 24, 2017, Deputy FBI Director McCabe called General Flynn requesting a meeting, to which Flynn agreed, not knowing he was being set up. During this call, McCabe advised that if General Flynn wished to have anyone else at the meeting, including the White House Counsel, the FBI would have to elevate the issue to the DOJ. Such a comment was designed by the Deputy FBI Director to get the target of an investigation to speak with federal agents without any counsel present. McCabe further downplayed the need for counsel by telling General Flynn that this was an informal meeting, just to put the Kislyak calls being discussed in the press to bed.

94.　Later that same day, FBI counterintelligence agents Peter Strzok and Joe Pientka interviewed General Flynn at his office in the White House. Neither agent informed General Flynn prior to or during this meeting that General Flynn's statements could, and likely would, be used against him in a criminal prosecution. Neither of them informed General Flynn that he was the subject of an investigation. The agents acted casual and friendly toward General Flynn, never putting him on notice of the dire consequences of any misstatement he might make, however innocent or immaterial.

95.　During this interview, FBI agents Strzok and Pientka were attempting to trap General Flynn in a misstatement or omission so that they

could charge him with a false statement violation of 18 U.S.C. § 1001. This malicious intent continued throughout the FBI's investigation and the subsequent investigation and prosecution by the Special Counsel's office. Exhibit D at 8 n.2.

96.    Despite this intent, neither of the FBI agents warned General Flynn before the beginning of the interview about the possible penalties involved with misstatements, omissions, or lies to an FBI agent. Reports indicate that whether to give General Flynn such a warning was specifically discussed amongst FBI leadership prior to General Flynn's interview, but FBI leadership did not want to tip off General Flynn to the true purpose of the interview. They wanted him fully at ease and without legal counsel.

97.    The intentional decisions by FBI leadership to manipulate General Flynn to have the interview without counsel and not to warn him of the potential penalties emphasize the malicious nature of the improperly continued Crossfire Razor investigation into General Flynn.

98.    Additionally, prior to the interview, the FBI engaged in internal discussions about whether to show General Flynn the transcripts of his calls with Kislyak.

99.    Because the FBI already had these transcripts, General Flynn's answers during an interview would have shed no light on whether and what he communicated with Kislyak. Due, at least in part, to these highly unusual

and deliberately irregular procedures, the DOJ ultimately admitted—as indeed it had no choice but to admit—that it could not explain, much less prove to a jury beyond a reasonable doubt, how the allegedly false interview statements by General Flynn could be "material" to an investigation that—as explained above—was continued with the purpose of eliciting those false statements and to thereby entrap General Flynn.

100.   Because the FBI possessed the transcripts, the only explanation for not providing them to General Flynn during the interview—as was standard protocol—was that the purpose of the interview was not to get to the truth (which they knew) but to trap General Flynn in a misstatement or omission, as indicated by Bill Priestap that very morning.

101.   General Flynn's statements could not have conceivably influenced an investigation that no longer had either a legitimate counterintelligence or criminal purpose. Moreover, even if they could be material, the DOJ did not believe it could prove that General Flynn knowingly and willfully made a false statement beyond a reasonable doubt.

102.   Tellingly, when asked by the National Security Division of the DOJ whether the FBI would like to conduct a follow-up interview with General Flynn, Deputy Director McCabe emphatically said no. Sally Yates was apparently surprised by this, but the reason was obvious. McCabe did not want a follow-up interview because the mission had been accomplished. General

Flynn had been neutralized and would no longer be an obstacle to continuing the Crossfire Hurricane investigation into President Trump.

103.  The White House was briefed on the supposed misstatements made by General Flynn to the FBI, and as a result, on February 13, 2017, General Flynn was forced to resign from his position as NSA. That, however, was only the beginning of the torment in store for General Flynn at the hands of Defendant's agents and agencies, in their crusade to destroy President Trump and his allies.

### Defendant Initiates Prosecution of General Flynn without Any Legitimate Legal or Factual Basis

104.  Following the spurious January 24, 2017 interview, Strzok and Pientka took three weeks to submit their notes. FBI regulations, however, require notes about interviews to be submitted five days after the interview. *United States v. Harrison*, 524 F.2d 421, 425 (D.C. Cir. 1975). In the interim, Strzok consulted with FBI lawyer Lisa Page—with whom he was having an extra-marital affair at the time—about how to best draft the notes of the Flynn interview. FBI regulations again, however, suggest that the notes be submitted by the agent that did the interview based on their recollection and notes, not outside sources. *Id.*

105.  Despite the improper delay, and multiple revisions, the notes submitted by Strzok and Pientka did not support a prosecution of General

Flynn. The notes indicated that General Flynn was unguarded in the interview and clearly viewed the agents as allies. The notes also indicated that General Flynn exhibited a very sure demeanor and did not give any indicators of deception.

106.   Both of the agents had the impression at the time that Flynn was not lying or did not think he was lying. After reviewing the case notes, FBI Director Comey even stated that there was only an argument to be made that General Flynn lied.

107.   Despite the obvious knowledge that the interview was not material to the Crossfire Razor investigation's purpose and that the interviewing agents and Comey believed that General Flynn either did not lie or only may have lied—and at that, unintentionally—the FBI used these doctored notes, submitted far past their deadline, to prosecute Flynn, not for any real underlying misconduct, but for allegedly lying to the FBI during the interview that the FBI completely botched according to the DOJ's own regulations.

108.   On May 17, 2017, Deputy Attorney General Rod Rosenstein appointed Robert S. Mueller to serve as Special Counsel to oversee the investigation into Russian interference in the 2016 election. This resulted in the creation of the SCO within the DOJ. The SCO assumed the investigation and took over the DOJ's role in working with the FBI investigative teams assigned to the relevant investigations.

109.   Strzok and Page investigated General Flynn as a way to "stop Trump" and in an attempt to get false testimony from General Flynn that President-elect Trump was a Russian asset, and they continued their scheme when the investigation moved from the DOJ more broadly to the SCO. As part of their efforts to "stop Trump," FBI agents, including Pientka, made false statements to the FISA court during the investigation into General Flynn.

110.   On November 30, 2017, the SCO filed a criminal information against General Flynn, officially initiating a false, reckless, abusive, and malicious felony criminal prosecution against him. The information improperly charged General Flynn with one count of making false statements in violation of 18 U.S.C. §1001(a)(2). The SCO falsely asserted in the information that General Flynn had intentionally omitted and denied speaking with Russian Ambassador Kislyak during an interview with FBI agents Strzok and Pientka on January 24, 2017.

111.   The SCO initiated the prosecution despite knowing General Flynn had not made false statements, that even if he did make false statements, they were unintentional and were not material to the Crossfire Razor investigation. SCO had no reasonable belief that General Flynn had committed the criminal offense and therefore had no probable cause to bring this information.

112.   At the time, the DOJ, by the SCO through Senior Assistant Special Counsel Brandon Van Grack, filed the information, it was aware that Strzok

and Pientka wrote, in their interview notes, they did not believe General Flynn had lied during their January 24, 2017, interrogation. The DOJ was further aware that the FBI only kept the Crossfire Razor investigation into General Flynn open to investigate the Flynn-Kislyak calls, which were not within the scope of the Crossfire Razor investigation, and there was no independent criminal investigation opened into the Flynn-Kislyak calls.

113. Further, at the time the SCO filed the information, the SCO was in possession of Strzok's notes that described the January 10, 2017, meeting in the Oval Office, wherein President Obama, Vice President Biden, Comey, and others described General Flynn's conversations with Kislyak as "legit." "Legit" in this context meant that General Flynn's conduct was legitimate and, therefore, not criminal or improper. It was this meeting where the DOJ disregarded Vice President Biden's suggestion to use the Logan Act.

114. Additionally, any charge under 18 U.S.C. 1001(a)(2) must be a false statement that is material to the underlying investigation or proceeding before a tribunal. As previously discussed, even if General Flynn's statements could qualify as false, they were not material.

115. At the time the information was filed, the SCO knew that General Flynn was innocent of any illegal contacts with any foreign power or any material misstatements to the FBI. Still, it commenced the prosecution of General Flynn.

116.   The DOJ, through its officers and employees in the SCO, with the assistance of the other named wrongdoers, had malicious intent when it unlawfully investigated and prosecuted General Flynn despite knowing his legal innocence of the charges brought.

117.   The named wrongdoers were all aware of the fact that General Flynn was not a Russian agent, and there was no basis for any further investigation or initiating any prosecution. Nevertheless, the individual federal employees and officials decided to prosecute General Flynn anyway, destroy General Flynn professionally, block General Flynn from holding a position of influence in the government, and thwart President Trump's agenda.

118.   Strzok and Page had a stated motive to stop Trump at least as early as August 15, 2016, and they endeavored through their work in the Crossfire Razor investigation and subsequent SCO prosecution of General Flynn to advance that purpose. Page participated and assisted Strzok in his partisan, malicious actions. They conceived of the initial investigation into General Flynn as an insurance policy should Presidential candidate Hillary Clinton lose the 2016 election. When Clinton lost the election, Strzok put this insurance policy into motion.

119.   The named wrongdoers knew that General Flynn's calls with Kislyak were "legit," and instead of closing the Crossfire Razor investigation,

they tried to think of new, even unprecedented, ways to investigate and prosecute General Flynn.

120. Strzok and Pientka continued to participate in the investigation and prosecution of General Flynn despite having certified that they did not believe General Flynn intentionally lied. Intent is a necessary element of a Section 1001 conviction.

121. During the improper prosecution of General Flynn, the SCO willfully failed to disclose exculpatory evidence in violation of its constitutional obligations under *Brady v. Maryland,* 373 U.S. 83 (1963). The exculpatory evidence the SCO failed to disclose included, but is not limited to, the notes from Strzok and Pientka showing the FBI believed General Flynn did not lie during his January 24, 2017, interview, and the notes describing the Oval Office meeting wherein Comey stated General Flynn's calls with Kislyak were "legit," and wherein Vice President Biden suggested using the Logan Act as a basis for prosecuting General Flynn. The SCO and one of its lead prosecutors, Van Grack, possessed these documents and actually prosecuted General Flynn. Further, Van Grack refused to disclose this plainly and fully exculpatory material in violation of his *Brady* obligations.

122. Each of these examples are plainly exculpatory, either because they directly tend to show General Flynn's innocence of the §1001 violation, or

because they indirectly tend to show his innocence by revealing the nefarious motivation behind the prosecution.

123.   The SCO prosecuted General Flynn despite knowing his factual and legal innocence and the abuse of process engaged in during the investigation and prosecution of General Flynn. The FBI continued investigating General Flynn even when it knew that General Flynn was not a Russian agent.

124.   After General Flynn was deliberately, knowingly, maliciously, and falsely charged with the §1001 criminal violation, the United States District Court for the District of Columbia severely limited General Flynn's liberty to travel freely within and without the United States. The District Court imposed travel restrictions on General Flynn, against his will, within the boundaries fixed by the United States and even to boundaries within the United States. As a result of General Flynn's unlawful prosecution and detention, General Flynn was unable to travel freely inside and outside of the United States.

125.   Not only was his reputation permanently stained by Defendant's unlawful investigation and prosecution, but he was unable to carry on his international consulting business personally. For the above reasons, the restrictions severely curtailing General Flynn's movements were unlawful, just as the prosecution that created General Flynn's movement restrictions was unlawful.

126.   Further, the SCO and the FBI misled the FISA court, proceeded with an investigation into General Flynn's supposed "Russian ties" when they knew he had none, and threatened his son, Michael Flynn, Jr., with prosecution unless he pled guilty to a §1001 offense. All of these facts and others demonstrate that Defendant acted with malice in investigating and prosecuting General Flynn.

127.   As discussed above, on May 7, 2020, the DOJ, through United States Attorney O'Shea, moved to dismiss the prosecution against General Flynn. In doing so, the DOJ stated that the government does not have a substantial federal interest in penalizing a defendant for a crime that it is not satisfied occurred or that it does not believe it can prove beyond a reasonable doubt. The DOJ motion to dismiss laid out in great detail the underlying facts and legal circumstances surrounding the unjustified and unsupported prosecutions of General Flynn and why the case should never have been brought.

128.   Proof of a false statement to federal investigators under § 1001(a)(2) requires more than a lie, and the FBI and the DOJ were not even sure that General Flynn had lied when the prosecution was brought. It also requires demonstrating that such a statement was material to the underlying investigation. Section 1001 prohibits "knowingly and willfully . . . mak[ing] any materially false, fictitious, or fraudulent statement or representation" in a

"matter within the jurisdiction of the executive . . . branch of the Government of the United States." 18 U.S.C. § 1001.

129.   Based on an extensive review of its investigation and prosecution of General Flynn, the DOJ determined that continuing the prosecution of General Flynn would not serve the interests of justice. Under the *Principles of Federal Prosecution,* the government should not prosecute an individual unless the attorney for the government believes that the admissible evidence is sufficient to obtain and sustain a guilty verdict by an unbiased trier of fact.

130.   In General Flynn's prosecution, the evidence showed his statements, regardless of whether any were false, were not material to any viable counterintelligence investigation—or any investigation—initiated by the FBI. The FBI itself recognized that it lacked any sufficient grounds to sustain its initial counterintelligence investigation when it sought to close that very investigation without an interview of General Flynn.

131.   With its counterintelligence investigation no longer justifiably predicated, the communications between General Flynn and Kislyak—the FBI's sole basis for resurrecting the investigation on January 4, 2017—did not warrant continuing the existing counterintelligence investigation, reopening or redirecting the existing counterintelligence investigation, or opening a new criminal investigation.

132. Notably, the FBI considered, but did not open, a criminal investigation based on General Flynn's calls with Kislyak. Indeed, the FBI never even attempted to open a new investigation of General Flynn on these grounds.

133. In dismissing its prosecution against General Flynn, the DOJ determined that General Flynn's calls with the Russian ambassador—the only new information to arise after the FBI's decision to close out his investigation— did not constitute a sufficient articulable factual basis to re-open any counterintelligence investigation or open a criminal investigation into General Flynn.

134. In addition to the FBI's changing justifications for the FBI's ongoing probe of General Flynn, the FBI's irregular procedure that preceded his interview also proves the FBI was eager to interview General Flynn irrespective of any legitimate investigative purpose. It is undisputed the FBI agents breached standard procedure of arranging interviews of White House personnel through the White House Counsel's Office and did not notify DOJ leadership or White House personnel about the interview in advance.

135. In addition, Deputy FBI Director McCabe affirmatively and effectively discouraged General Flynn from procuring the assistance of White House or personal counsel during the interview, or even notifying the White House Counsel's Office about the interview at all.

136. The interviewing agents also failed to issue the standard § 1001 admonitions about the consequences of false statements to investigators. Nor did the FBI even notify Acting Attorney General Yates that the interview was happening until the interviewing agents were already en route to General Flynn. Even worse, before the FBI's interviewing agents even scheduled and left for the interview, the FBI deliberately ignored a preexisting request for information about the Crossfire Razor investigation from the Acting Attorney General. In other words, FBI Director Comey knew that Acting Attorney General Yates would not approve of the interview of Flynn and deliberately waited to inform her until it was too late to prevent the interview—a knowing, willing, and deliberate violation of the legal and political chain of command.

137. The FBI agents, who actually interviewed General Flynn, had the impression that General Flynn was not lying or at least did not think he was lying. Moreover, the statements in question were not, by their nature, easily falsifiable. During his interview with the FBI agents, General Flynn offered either equivocal ("I don't know") or indirect responses or stated that he did not remember the matter in question.

138. Considering the vague substance of General Flynn's answers, the FBI's estimation of General Flynn's truthfulness, the inconsistent FBI records as to the actual questions and statements made, FBI Director Comey's own sentiment that the case was, at best, a close one, and the information available

to the DOJ and the SCO at the time it chose to file the criminal information indicated that there was not only no probable cause to support their claim that General Flynn knowingly and willingly lied to investigators during the interview, but it wasn't even close.

139.   U.S. District Court Judge Emmet Sullivan, however, refused to approve the DOJ's dismissal of its prosecution, necessitating an appeal to the D.C. Circuit Court of Appeals by General Flynn. The D.C. Circuit initially ordered Judge Sullivan to dismiss the charges and case against General Flynn in its entirety. In response, Judge Sullivan—the supposedly disinterested judge, who mused aloud about whether the Department of Justice could charge General Flynn for treason (it could not), and who stated on the record to General Flynn that "[a]rguably, you sold your country out"—*retained counsel*, literally becoming an interested party, and petitioned for *en banc* review from the D.C. Circuit. After *en banc* review, the D.C. Circuit remanded the case to Judge Sullivan for appropriate dispatch, who continued to drag his feet on dismissal of the case.

140.   On November 25, 2020, after having suffered nearly three years of wrongful prosecution and torment by the U.S. Government, General Flynn received a presidential pardon. On December 8, 2020, the criminal case against General Flynn was *finally* dismissed by Judge Sullivan in its entirety.

141.   Judge Sullivan in his dismissal colloquy could not resist taking a few parting partisan jabs at General Flynn, but he ultimately dismissed the entire criminal information filed against General Flynn.

142.   General Flynn was the target of a politically motivated FBI investigation and the DOJ and the SCO prosecution that had no merit when it began, no merit during its course, and no merit in the end when the charges were withdrawn and dismissed by the DOJ and ultimately dismissed by Judge Sullivan after General Flynn received a full presidential pardon.

143.   During that meritless and unlawful FBI investigation and the DOJ and the SCO prosecution, General Flynn was falsely and maliciously painted by the Defendant as a traitor to his nation, alleging that he was engaged in illicit actions with a hostile foreign power. These malicious allegations were so pervasive and so widely disseminated in the news and in political circles, that even the sitting judge regurgitated them at General Flynn's sentencing hearing.

144.   Defendant's agents and agencies' targeting of a United States citizen for baseless counterintelligence investigation and criminal prosecution and eliciting a plea bargain through threatening family members is dangerous and outrageous conduct of the highest order. The fact that it was orchestrated and carried out at the highest levels of the FBI, DOJ, SCO, and EOP makes it all the more outrageous. That it was done intentionally, purposefully,

deliberately, and with reckless and total disregard for the rights, reputation, and position of General Flynn—the President's highest-ranking national security advisor, a retired United States Army Lieutenant General with 33 years of honorable military service to our country, and a citizen of the United States—makes Defendant's agents and agencies' conduct despicable, even by partisan Washington standards.

145.   Unsurprisingly, General Flynn has suffered greatly from the Defendant's agents and agencies' politically driven, personally motivated, baseless, and outrageous investigation and prosecution. This harm is exacerbated by the fact that General Flynn has dedicated his entire adult life to serving the United States through military service and his civilian service as the National Security Advisor to a President.

146.   The betrayal and persecution he suffered, by the country he spent decades defending and serving, has caused General Flynn severe emotional distress, as it would anyone in his position. Moreover, because of the improper EOP and DOJ coordinated prosecution, General Flynn lost the once-in-a-lifetime and priceless honor to serve as the highest-ranking national security advisor to a President of the United States.

147.   General Flynn was injured in other ways due to the vicious, false attacks on his character, including but not limited to compensatory and financial damages, including attorney's fees and expenses, court costs and

other legal expenses, reputational damages, loss of goodwill, and the loss of earnings and future earnings from his international consulting business, and the loss of earnings and future earnings resulting from being denied the opportunity to serve an entire term as the President's National Security Advisor.

148.   Overall, the harm to General Flynn has been and is immense. As a result of this unjustifiable, outrageous, and malicious prosecution of General Flynn and the abuse of process engaged in to carry it out by FBI agents, FBI leadership, Justice Department prosecutors, and the highest-ranking EOP officials in the Obama administration, punitive damages are not only warranted but essential to deter any present or future FBI, DOJ, SCO, and EOP official from harming anyone else like they harmed General Flynn. Even if punitive damages are not allowed in this case, General Flynn is entitled to be fully compensated for each and every one of his pecuniary and non-pecuniary losses resulting from Defendant's malicious and outrageous conduct against him.

## CAUSES OF ACTION

### COUNT I
### FEDERAL TORT CLAIMS ACT
### Malicious Prosecution

149.   Plaintiff incorporates by reference the above paragraphs as though set forth fully herein.

150.    The Federal Tort Claims Act provides "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

151.    Plaintiff has exhausted his administrative remedies under 28 U.S.C. § 2675 of the Federal Tort Claims Act as a prerequisite to instituting a claim against the United States for money damages for injury or loss of property or personal injury caused by the negligent or wrongful act or omission of any employee of the United States government while acting within the scope of his or her office or employment.

152.    By letter dated February 24, 2022, Plaintiff presented his administrative claim to the DOJ.

153.    The DOJ has not responded within the prescribed statutory deadline to General Flynn's Form 95 submission and, therefore, General Flynn's Form 95 is, as of the filing of this Complaint, deemed denied, exhausting General Flynn's administrative remedies and granting him the right to sue in this Court.

154.    The named wrongdoers Defendant is responsible for are investigative or law enforcement agencies, or agencies with supervisory authority over such agencies, whose agents are investigative or law enforcement officers within the meaning of 28 U.S.C. § 2680(h).

155.   Defendant maliciously investigated and prosecuted General Flynn by initiating and continuing a baseless counterintelligence investigation and by filing a criminal information lacking probable cause. Defendant's acts were willful, knowing, deliberate, and malicious, as explained above.

156.   As a direct and proximate result of Defendant's actions, General Flynn suffered harm. He was falsely branded as a traitor to his country, lost at least tens of millions of dollars of business opportunities and future lifetime earning potential, was maliciously prosecuted and spent substantial monies in his own defense, and has suffered and will continue to suffer mental and emotional pain for the rest of his life, in addition to other pecuniary harms such as costs, fees, attorneys' fees, and other losses.

## COUNT II
### FEDERAL TORT CLAIMS ACT
**Abuse of Process**

157.   Plaintiff incorporates by reference the above paragraphs as though set forth fully herein.

158.   The named wrongdoers Defendant is responsible for abused their official positions and authority to bring process against General Flynn for an improper motive.

159.   Defendant attempted to utilize their ability to bring process against General Flynn's son to coerce General Flynn into pleading guilty to a Section 1001 charge. Defendants further sought to use process against General

Flynn to coerce General Flynn into testifying against other members of the Trump administration or Trump Campaign, including President Trump, despite the process brought having no legitimate basis in law or fact.

160. As a direct and proximate result of Defendant's actions, General Flynn suffered harm. He was falsely branded as a traitor to his country, lost at least tens of millions of dollars of business opportunities and future lifetime earning potential, was maliciously prosecuted and spent substantial monies in his own defense, and has suffered and will continue to suffer mental and emotional pain for the rest of his life, in addition to other pecuniary harms such as costs, fees, attorneys' fees, and other losses.

## PRAYER FOR RELIEF

161. Plaintiff respectfully requests this Court enter a judgment in his favor and grant relief against the Defendant as follows:

    a. Compensatory damages in an amount to be determined at trial but expected to exceed $50,000,000.00, pursuant to Plaintiff's claims against Defendant United States of America;

    b. Reasonable attorneys' fees with respect to all of Plaintiff's causes of action against the Defendant; and

    c. Any other relief the Court deems proper.

Dated: March 3, 2023                   MICHAEL T. FLYNN
                                            *By Counsel*

Respectfully submitted,


/s/ *Jared J. Roberts*
Jared J. Roberts
(Fl. Bar No. 1036550)
Shawn M. Flynn
(Fl. Bar No. 1040911)
Jason C. Greaves
(*pro hac vice* application
forthcoming)
Matthew M. Dummermuth
(*pro hac vice* application
forthcoming)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930
Email: jared@binnall.com
         shawn@binnall.com
         jason@binnall.com
         matt@binnall.com

*Counsel for Plaintiff*