# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### Tampa Division

**MICHAEL T. FLYNN**,
an individual,

**Plaintiff,**

**v.**

No.: 8:23-cv-485 (MSS/CPT)

**UNITED STATES OF AMERICA**,
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001,

**SECOND AMENDED COMPLAINT**

**Defendant.**

---

1.     On May 7, 2020, the United States Department of Justice moved to dismiss the criminal information that had been filed on November 30, 2017, against Plaintiff Lt. Gen. Michael T. Flynn, U.S. Army, Retired ("General Flynn"), charging him with one count of willfully and knowingly making false, fictitious, and fraudulent statements in a matter within the jurisdiction of the executive branch of the government of the United States. In this motion, the DOJ admitted, through Timothy Shea, then United States Attorney for the District of Columbia, that:

> The Government is not persuaded that the January 24, 2017 interview [of General Flynn] was conducted with a legitimate investigative basis and therefore does not believe Mr. Flynn's statements were material even if untrue. Moreover, we [sic] not

believe that the Government can prove either the relevant false statements or their materiality beyond a reasonable doubt.

2.    The United States therefore admitted that they should never have brought this prosecution against General Flynn because the interview that formed the basis of the criminal information should never have happened and, even though it did happen, it was not a proper basis for the felony charge.

3.    Of particular relevance, DOJ and FBI personnel knew of the lack of basis for the investigation, interview, and charge before the criminal information was ever filed. Agents of the United States of America utilized their official positions and offices to initiate a baseless investigation, keep that investigation open, and undertake illegitimate investigative steps, with the object of and ultimate result of unjustified criminal charges being filed against General Flynn.

4.    This lawsuit seeks accountability and damages against the United States for these wrongs committed against General Flynn through its agents. Specifically, General Flynn seeks relief herein for violations of his constitutional and other legal rights in connection with this wrongful and malicious prosecution and gross abuse of process.

5.    Defendant improperly and politically targeted General Flynn because of his lawful association with the 2016 presidential campaign of Donald J. Trump and his position as National Security Advisor in the Trump

Administration. General Flynn is entitled to relief for Defendant's unjustified and illegal actions, including but not limited to malicious prosecution and abuse of process.

6.     The official misconduct occurred in connection with FBI investigations Crossfire Hurricane and Crossfire Razor, each fraught with egregious legal and ethical misconduct admitted by DOJ, each lacked investigative predicate, and each prompted by the FBI's continued pressure exerted on the Special Counsel's Office to bring the unfounded criminal information against General Flynn on behalf of the DOJ.

7.     The FBI Crossfire investigations and the resulting criminal case against General Flynn were brought without probable cause, based on deficient information, and caused substantial and irreparable harm to General Flynn. Defendant's conduct, which began not later than August 2016 and continued until at least December 2020, constituted serious violations of General Flynn's constitutional and other rights.

8.     These devastating damages, not just to General Flynn personally, but to the reputation and public trust of the FBI, were forewarned. On the fateful day of January 24, 2017, when the FBI would later dispatch counterintelligence agents to interview General Flynn under false pretenses, Assistant Deputy Director E.W. ("Bill") Priestap had second thoughts. He asked whether their goal was to get to the truth, or to "get [Flynn] to lie, so we

can prosecute him or get him fired?" He ominously wrote: "Protect our institution by not playing games." What followed has been the fall of a once-venerable institution. The only way back to public trust, and for justice to be done for General Flynn, is to hold accountable the United States, whose agents ignored their statutory and constitutional duties.

## **SUMMARY OF CHANGES FROM AMENDED COMPLAINT**

9.    This Court previously dismissed the Amended Complaint on the grounds that some of the wrongdoing alleged was that of prosecutors, who did not qualify as "investigative or law enforcement officers" within the meaning of 28 U.S.C. § 2680(h), and that, as alleged, the Amended Complaint did not adequately establish an unbroken chain of causation between the wrongdoing of the investigative and law enforcement officers, and the initiation of criminal proceedings. This amendment addresses the Court's opinion in principally two ways.

10.    First, this amendment demonstrates the pressure exerted from the top-down at the highest levels of the FBI to procure the prosecution of General Flynn, regardless of the cost, and the complete lack of independence exercised by the SCO, that followed the FBI's lead. The virulently anti-Trump leadership of the FBI's Crossfire Hurricane investigative and law enforcement team, which transitioned to the leadership of the SCO, took part in, condoned, and

encouraged the most serious violations of law to keep Crossfire Hurricane and its sub-investigations open, not only for the malicious purpose of damaging President Donald J. Trump and General Flynn, but for self-preservation, knowing that successful, high-profile prosecutions would serve as post-hoc validation and cover for their misdeeds. This included illegally leaking highly classified information, actively concealing exculpatory information, lying to FISC judges to obtain renewals of FISA warrants, and prosecuting General Flynn, a man they knew to be innocent of any crime. When SCO prosecutors threatened General Flynn's son—newly a father himself, and also innocent of any crime—with federal prosecution, unlawfully coercing General Flynn into a secret side-deal to plead guilty in exchange for his son's freedom, they did so at the behest of the FBI leadership, including the new acting Director McCabe and the other FBI personnel who carried over into the SCO. They did so to provide cover for their FBI colleagues and superiors, keeping the unlawful investigation into President Trump alive, and hoping to "flip" General Flynn against President Trump—or at least to create the public perception that he had.

11.    Second, this amendment highlights newly discovered information that bears directly on the SCO's failure to provide exculpatory evidence to General Flynn—*i.e.*, *his actual innocence*—prior to his unlawfully-obtained plea agreement. It was previously assumed that the SCO was in possession of

this exculpatory evidence and intentionally withheld it. And while that would fit with the SCO's overall goal of securing a prosecution for the FBI at any cost, it now appears that the FBI leadership—specifically Director Comey and Assistant Director McCabe—concealed the fact that General Flynn was innocent, and the exculpatory evidence demonstrating that, in a way that SCO prosecutors would not have even known. Thus, even ignoring the pressure exerted by the investigative and law enforcement officers, the securing of the prosecution and the coercion exercised by the SCO, were directly linked to the actions of Comey and McCabe.

12.    To date, many documents relevant to this case remain under lock and key, remain heavily redacted, or have possibly been destroyed. For example, an unredacted, original 302 of the FBI's interview of General Flynn has never been produced. Although President Trump ordered the release of additional Crossfire Hurricane-related material on March 25, 2025, relatively few documents have come to light. This amendment attempts to synthesize what is currently available, but it is expected that discovery in this case will produce much more.

**PARTIES**

13.    Plaintiff Lt. Gen. Michael T. Flynn, U.S. Army, Retired ("General Flynn"), is an individual who is a resident and citizen of the State of Florida. At the time of the events and allegations in this Complaint, General Flynn was

an advisor to then-presidential candidate Donald J. Trump, and later the U.S. National Security Advisor in the Trump Administration. Previously, General Flynn had been the director of the Defense Intelligence Agency in the Obama Administration.

14.    Defendant United States of America is sued under 28 U.S.C. § 1346.

### PRIMARY WRONGDOERS ON BEHALF OF THE UNITED STATES

15.    The following individuals are interconnected through their roles in the FBI's overarching Crossfire Hurricane investigation and the sub-investigation into General Flynn, but it is not a comprehensive list, as many names of United States law enforcement agents and officials remain confidential and redacted from publicly available documents.

16.    References to any actions taken by agencies of the United States, such as the Federal Bureau of Investigation ("FBI"), Department of Justice ("DOJ"), Special Counsel's Office ("SCO"), and Executive Office of the President ("EOP") encompass actions by their officers, appointees, employees, agents, and/or contractors, both known and unknown to Plaintiff.

17.    Barack Obama was President of the United States from January 2009 to January 2017. He appointed General Flynn to be the Director of the Defense Intelligence Agency in 2012. However, after General Flynn bucked at

President Obama's self-serving, and false, narrative about the supposed weakness of ISIS in the Middle East, and refused to tow the administration line, Obama forced General Flynn to resign from the position in August 2014. General Flynn, in retirement, was vocally critical of Obama and accused him of lying to the American people. The subsequent resurgence of ISIS as a dominant power in the region, proving General Flynn right, was highly embarrassing to President Obama, who took Flynn's criticisms personal—so much so that during President Trump's transition, Obama warned Trump not to appoint General Flynn to any high-level position.[1] Despite being briefed by CIA Director John Brennan on July 28, 2016, on intelligence that the Hillary Clinton campaign intended to vilify then-candidate Trump by stirring up rumors that he was being assisted by Russia as a distraction from her email scandal, President Obama allowed the FBI to open and continue the Crossfire Hurricane investigation. Moreover, at a January 5, 2017 meeting, President Obama instructed his intelligence community apparatus—including FBI Director James Comey and Deputy Director Andrew McCabe, CIA Director John Brennan, Acting Attorney General Sally Yates, ODNI Director James Clapper, and National Security Advisor Susan Rice—not to share information with the incoming administration regarding the Russia collusion investigation,

---

[1] Indeed, aside from General Flynn, the only other person President Obama warned incoming President Trump about was Kim Jong Un, the communist dictator of North Korea.

8

and took special interest in the Flynn investigation. That same day, President Obama's office, by way of his chief of staff, Denis McDonough, made an unmasking request of General Flynn.

18.     James Comey was the Director of the FBI from September 2013 to May 2017. While serving as FBI Director, Comey verified under penalty of perjury three false FISA warrant affidavits. Comey initiated, sustained, and kept hidden the overarching Crossfire Hurricane investigation and sub-investigations of the Trump campaign and its associates—including of General Flynn—with knowledge of the lack of valid investigative predicate, and with knowledge of CIA intelligence that Hillary Clinton personally approved a plan to vilify Trump by tying him to Russia as a distraction from her email scandal. Comey approved and initiated the decision to send agents to interview General Flynn on false pretenses and without notice to White House counsel, knowing that he was in violation of protocol. Under Comey's authority, or in coordination with Comey, high-level FBI officials designated the Trump/Russia-collusion investigations as "Prohibited Access" in Sentinel—the FBI's electronic case management system—an extreme measure that hid the existence of the investigation and exculpatory documents from agents and DOJ personnel. The President of the United States dismissed Comey as FBI Director on May 9, 2017; however, Comey ensured that the un-predicated investigation could continue without oversight by engineering the

appointment of Robert Mueller—his close, personal, friend, and his decades-long mentor and confidant—as Special Counsel.

19. Andrew McCabe was the Deputy Director of the FBI from February 2016 to January 2018. While serving as Deputy Director, he was an original and primary participant in the Crossfire Hurricane investigation. McCabe also was the FBI's lead signatory of the final FISA renewal affidavit in June 2017 and was a key participant in the initiation and continuation of the investigation into General Flynn without a legitimate investigative predicate. McCabe, who held special animosity toward General Flynn because of his participation in a whistleblower complaint that implicated McCabe in 2014, participated in the decision to send agents to interview General Flynn on false pretenses and without notice to White House counsel, and later pressured SCO into wrongfully prosecuting General Flynn. McCabe authorized the initial Crossfire Hurricane investigation and put Peter Strzok in charge. McCabe designated or authorized the Trump/Russia-collusion investigations to be marked "Prohibited Access" in Sentinel—the FBI's electronic case management system—an extreme measure that hid the existence of the investigation and exculpatory documents from agents and DOJ personnel.

20. Peter Strzok was a career FBI agent until August 2018 and served as Deputy Assistant Director of Counterintelligence ("DADC"). As the DADC, Strzok supervised the investigation of General Flynn and was a key

participant in the initiation of Crossfire Hurricane. As shown by his disgraceful actions and internal communications, Strzok did not just hold special contempt for Donald J. Trump and for General Flynn, but that he actively abused his position for the purpose of preventing presidential candidate Trump from being elected, and when that failed, to continue the malicious investigation and prosecution of President Trump's associates—particularly General Flynn—for the end result of ruining Trump's presidency and even forcing him to resign. Strzok was instrumental in the initiation and continuation of the investigation into General Flynn without a legitimate, investigative predicate, the interview of General Flynn under false pretenses and without notice to White House counsel, and the pressure campaign at SCO to wrongfully prosecute General Flynn. Strzok reported directly to Assistant Director of Counterintelligence E.W. "Bill" Priestap, but regularly side-stepped his boss on the Trump and Flynn investigations, communicating either directly with McCabe or going through his Special Assistant, Lisa Page, with whom Strzok was having an extramarital affair. Strzok, among other FBI law enforcement officers who were part of the investigation into President Trump and General Flynn, continued to influence that investigation and prosecution as part of the SCO. The FBI later dismissed Strzok stating, "[Strzok's] repeated selfishness has called into question the credibility of the entire FBI." *See* Exhibit A.

21.    Joe Pientka, III, during the relevant period, served as a Supervisory Special Agent of a Foreign Counterintelligence Squad at the FBI's Washington Field Office. In this role, Pientka personally participated in the interview of General Flynn. After Christopher Steele was fired by the FBI as a source for violating FBI regulations, the FBI was prohibited by its own regulations from doing any further work with Steele or using any information gathered by Steele. Nevertheless, the FBI (McCabe, Strzok, Lisa Page, and Pientka) devised and implemented a scheme to circumvent FBI regulations by having Steele continue to provide information to the FBI through Bruce Ohr.

22.    Bill Priestap, Assistant Director of FBI Counterintelligence Division, deliberately shut down the involvement of the Directorate of Intelligence in an enhanced validation review of Christopher Steele. He was aware of the Clinton Plan Intelligence that was ignored by the FBI. Priestap would direct field offices to open cases on particular targets associated with the Trump campaign and the field offices would push back due to insufficient predication.

23.    James Baker, FBI General Counsel, reported to James Comey and advised on the legal aspects of Crossfire Hurricane.  Michael Sussmann, a Perkins Coie lawyer who represented the DNC and Clinton campaign, provided Baker data alleging Russian collusion with the Trump campaign. The assigned FBI case team was not able to interview the source of the

allegations—Sussmann—because Baker or other senior FBI officials improperly protected his identity either to further the allegations or to hide his ties to the DNC and Clinton campaign. Case team agents considered filing a whistleblower complaint against Baker as a result.

24.     Bruce Ohr, Deputy Assistant Attorney General, and Director of the Organized Crime Drug Enforcement Task Forces (OCDETF) during the relevant period, worked as a high-ranking, politically appointed DOJ official. Ohr also allegedly served as an FBI source, passing false Trump-Russia information from Christopher Steele to Joseph Pientka. Pientka, acting as Ohr's alleged FBI informant handler, prepared a dozen FBI 302 interview reports citing Bruce Ohr as the source, even though the false information was really from Steele, to create the appearance the FBI was not violating its own regulations as it continued to receive and use false information from Steele. Nellie Ohr, Bruce Ohr's wife, was working with Steele at Fusion GPS to create false Trump-Russia allegations.

25.     Robert S. Mueller, III, was unlawfully appointed by then-Acting Attorney General Rod J. Rosenstein to serve as Special Counsel to continue the meritless investigation into alleged "links and/or coordination between the Russian Government and individuals associated with the campaign of President Donald Trump" and to prosecute supposed federal crimes arising therefrom, including the Crossfire Razor investigation and eventual

prosecution of General Flynn. Even though Mueller lacked any constitutional authority to prosecute General Flynn, he did so in coordination with and under pressure from the FBI and his friend and confidant James Comey. Moreover, Mueller was the last person who could be considered independent from the FBI, having served as only the sixth FBI Director in our nation's history for twelve years (2001 to 2013), longer than anyone since J. Edgar Hoover. In addition, Mueller was the last person who could be considered an independent check on James Comey, who replaced Mueller as FBI Director on September 4, 2013. While serving as the Deputy Attorney General, Comey was FBI Director Mueller's direct supervisor, and both threatened to resign at the same time in March 2004 over renewal of a warrantless wiretapping terrorist surveillance program. Together, Mueller and Comey were the ultimate insiders of the FBI and Justice Department, sharing the same worldview and experiences, not independent officials checking each other's decisions to ensure against overreach by either.

## JURISDICTION AND VENUE

26.    This Court has original subject matter jurisdiction over General Flynn's federal claims under 28 U.S.C. §§ 1331 and 1346(b)(1) because they arise under federal law and because the United States is a defendant.

27.    This Court has personal jurisdiction over the federal government defendant pursuant to 28 U.S.C. § 1346(b)(1).

28.    This Court is the proper venue pursuant to 28 U.S.C. § 1402(b) as Plaintiff resides within this judicial district.

## FACTUAL BACKGROUND

### History of General Flynn

29.    In 1981, General Flynn was commissioned as a second lieutenant in military intelligence in the United States Army. From 1981 until September 30, 2014, General Flynn honorably served his country in a variety of posts.

30.    On April 17, 2012, President Barack Obama nominated General Flynn as the Director of the Defense Intelligence Agency ("DIA") and the United States Senate subsequently confirmed that appointment. In this role, General Flynn was responsible for overseeing the DIA's mission to provide military intelligence to warfighters, defense policymakers, and force planners in the Department of Defense and the United States' broader Intelligence Community in support of United States military planning and operations and weapon systems acquisition.

31.    General Flynn served as DIA Director until stepping down from that role on August 7, 2014, and subsequently retiring from the Army on September 30, 2014. Admiral Mike Rogers, then President Obama's director of the NSA, praised General Flynn as "the best intelligence officer of the past 20

years." Following his retirement, General Flynn opened a successful international consulting business that he operated with his son, Michael Flynn, Jr. In 2016, General Flynn began consulting for several of the Republican candidates for president.

32.     In or around February 2016, General Flynn became a foreign policy advisor to then-Republican presidential candidate Donald J. Trump. General Flynn continued to serve in this role through the election and on the transition team when it was announced that he would be incoming President Trump's selection for National Security Advisor ("NSA").

**FBI Opens Crossfire Hurricane Investigation of
Donald J. Trump without Legitimate Investigative Predicate**

33.     On the night of July 31, 2016, the top two law enforcement officers in the United States government, James Comey and Andrew McCabe, along with their select inner circle that included virulently anti-Trump partisans— and adulterers—Peter Strzok and Lisa Page,[2] officially opened a full

---

[2] The following is just a sample of the anti-Trump animus expressed by Strzok and Page in their private correspondence:

| 2/13/16 | **Page**: "He simply can not be president" |
| 3/4/16 | **Page**: "God trump is a loathsome human." |
| | **Strzok**: "He's awful. . . . God Hillary should win 100,000,000 – 0." |
| | **Page**: "This man can not be president." |
| 7/11/16 | **Strzok**: "CNN poll [showing Trump tied with Clinton] has me stressed out" |
| 7/18/16 | **Page**: "And wow, Donald Trump is an enormous douche" |
| 7/19/16 | **Page**: "The whole thing [Trump] is like living in a bad dream" |
| 7/21/16 | **Strzok**: "Trump is a disaster. I have no idea how destabilizing his Presidency would be." |
| 8/6/16 | **Page**: "Trump should go f himself" |

"enterprise investigation" into Donald J. Trump's presidential campaign, to determine whether "individual(s) associated with the Trump campaign are witting of and/or coordinating activities with the Government of Russia." Code-named Crossfire Hurricane, the FBI lacked any valid investigative predicate to open a full investigation, much less the threshold requirement for an enterprise investigation of specific, articulable facts indicating that an organization is engaged in a pattern of racketeering, terrorism, or threats to national security.

34.    Despite the flimsy, self-contradictory, and easily falsifiable information supposedly linking Trump and his associates to Russia, the FBI accepted it uncritically. Worse, they actively ignored and avoided exculpatory

---

Strzok: "And F Trump"

**Page**: "And maybe you're meant to stay where you are because *you're meant to protect the country from that menace*." (emphasis added).

**Strzok**: "Thanks. It's absolutely true that we're both very fortunate. And of course I'll try and approach it that way. I just know it will be tough at times. *I can protect our country at many levels*, not sure if that helps." (emphasis added).

8/8/16    **Page**: "He's not ever going to become president, right? Right?!"

**Strzok**: "No. No, he's not. *We'll stop it*." (emphasis added).

8/16/16    **Strzok**: "I want to believe the path you threw out for consideration in Andy [McCabe]'s office – that there's no way he gets elected – but *I'm afraid we can't take that risk. It's like an insurance policy in the unlikely event you die before you're 40*." (emphasis added).

10/19/16    **Strzok**: "Trump is a fucking idiot . . . I CAN'T PULL AWAY. WHAT THE FUCK HAPPENED TO OUR COUNTRY, LIS?!??!?!"

There is no doubt that the sentiments exchanged between Strzok and Page are shared by many ordinary people. Unlike ordinary people, however, who might *wish* to influence the outcome of an election, Strzok and Page were in positions to do so, and the record shows that they attempted to do so by participating in the weaponization of the FBI against Trump.

information and CIA intelligence that the Clinton campaign was fabricating the Trump-Russia narrative as a distraction from Clinton's email scandal. At each point that the FBI should have shut down or at least questioned the validity of Crossfire Hurricane, they instead ramped it up, because of their desperation to prevent Trump from being elected, and, when that failed, to cause maximum damage to his presidency. Strzok and Page even fantasized that their efforts would result in a Nixon-style resignation.[3]

35.    The *official*, but pretextual basis for opening this *full* enterprise investigation was a memo received by the FBI three days earlier, on July 28, 2016, from Australian diplomat Alexander Downer, regarding a conversation he had had months earlier with a low-level, unpaid Trump foreign policy advisor, George Papadopoulos.

36.    Downer and his assistant had met Papadopoulos at Kensington Wine Rooms in London on May 10, 2016. They each had a drink, after which they parted ways and Downer had his assistant draft a standard memo back to his office in Australia, summarizing the meeting. The relevant portion of the memo read:

> Mr[.] Papadopoulos was, unsurprisingly, confident that Mr[.] Trump could win the election. He commented that the Clintons had "a lot of baggage" and suggested the Trump team had plenty

---

[3] On March 14, 2017, Page texted Strzok, "Finally two pages away from finishing [All the President's Men]. Did you know the president resigns in the end?! 😊" To which Strzok responded, "What?!?! God, that we should be so lucky."

of material to use in its campaign. He also suggested the Trump team had received some kind of suggestion from Russia that it could assist this process with the anonymous release of information during the campaign that would be damaging to Mrs[.] Clinton (and President Obama). It was unclear whether he or the Russians were referring to material acquired publicly of [sic] through other means. It was also unclear how Mr[.] Trump's team reacted to the offer. We note the Trump team's reaction could, in the end, have little bearing of [sic] what Russia decides to do, with or without Mr[.] Trump's cooperation.

Downer took no further action on this for over two months. However, on July 22, WikiLeaks released emails hacked or stolen from the Democratic National Committee ("DNC"), and on July 24, Clinton campaign manager Robby Mook announced on CNN's "State of the Union" that "experts are telling us Russian state actors broke into the DNC, stole these emails, and other experts are now saying that the Russians are releasing these emails for the purpose of actually helping Donald Trump." This framing—a key component of the Clinton plan to "vilify" Trump with the Russia collusion narrative, discussed below—jogged Downer's memory, and he reported his Papadopoulos conversation to the U.S. embassy in London, in person, on July 26.

37.     The Downer memo, full of hopelessly ambiguous hearsay within hearsay within hearsay, which did not factually line up with the DNC leak— since the DNC emails contained no information damaging to Clinton or Obama and were instead embarrassing to the DNC—was obviously not an adequate predicate for opening Crossfire Hurricane. This became even more apparent

after Strzok and Pientka flew to London on August 2, 2016, to interview Downer and his assistant.

38.    The interview was a dud. The Australians said that the memo was "purposely vague," because "Papadopoulos left a number of things unexplained" and "did not say he had direct contact with the Russians." Downer further said that he did not believe Papadopoulos was acting as an intermediary between the Trump campaign and Russia, and that Papadopoulos' musings may have been *entirely speculative*. This, of course, would have been *entirely consistent* with the common speculation at the time that Russia had hacked Clinton's email server—indeed, the night before Papadopoulos's meeting with Downer, Andrew Napolitano had reported on Fox News to Megan Kelly that Russia was in possession of Clinton's emails and was planning its next move. Moreover, as would have been known to the FBI— but not to Downer—most of the leaked DNC emails had not been written as of May 10, and the exfiltration of the DNC emails did not begin until May 23, so it was nonsensical for the FBI to infer that Papadopoulos's "suggestion" of a "suggestion" on May 10 had anything to do with a hack that had not yet occurred.

39.    The Downer tip was so flimsy, in fact, that Strzok has repeatedly *lied about it* to make it seem more significant than it was. He claimed in DOJ briefings, in press interviews, and in his book, that Downer came forward *after*

Donald J. Trump's infamous joke on July 27, 2016, of "Russia, if you're listening, I hope you're able to find the 30,000 emails that are missing. I think you will probably be rewarded mightily by our press." Strzok brazenly claimed that it was *Downer* who told him that it was these words that "jarred his memory." The problem with this, of course, is that Downer came forward on July 26. Also a problem for Strzok, Downer denies having ever said this. When Downer was later interviewed for the Durham Investigation, he backed away from the characterizations of the memo completely, saying that Papadopoulos "made no mention of Clinton emails, dirt, or any specific approach by the Russian government to the Trump campaign team with an offer or suggestion of providing assistance."

40.     As the Durham Report concluded, the government did not possess "any actual evidence of collusion in their holdings at the commencement of the Crossfire Hurricane investigation."

41.     That did not stop senior leadership at the FBI, as they had already been itching to open an investigation into Trump,[4] desperate to keep him from

---

[4] On July 23, 2016, Page texted Strzok, "Have we opened on [Trump] yet?" On July 28, Page again texted Strzok, "Have we opened on [Trump] yet? [angry face emoji]". Later that day, Strzok tells Page he wants to talk to her about "[o]ur open CI investigations relating to Trump's Russian connections." Later that same day, July 28, in an exchange about trying to consolidate all their efforts to investigate Trump, Page notes that it is "all Bill [Priestap] and I have been talking about *all week*." (emphasis added). Page says that "[i]t's all moving to[o] fast" and they both agree that they cannot wait two weeks for the agent they prefer to bring in rather than Pientka. Strzok was downright giddy at the prospect of investigating Trump, texting Page on July 31, immediately after officially opening Crossfire Hurricane:

becoming president,[5] and spurred on by the fabricated Trump-Russia collusion narrative being paid for and promoted by the Clinton campaign, through Fusion GPS and Christopher Steele.

42.    Just as the FBI was treating the Downer memo as though it were the smoking gun of Trump-Russia collusion, it was simultaneously ignoring a comparatively huge piece of contrary information. On July 26, 2016, the CIA intercepted communications showing that Hillary Clinton had personally sanctioned a strategy to "vilify Donald Trump by stirring up a scandal claiming interference by the Russian security service," for the stated purpose of distracting the public from her private email server scandal (the "Clinton Plan Intelligence"). The CIA considered this important enough to immediately escalate it to CIA Director Brennan, who briefed President Obama on it on July 28. The next day, July 29, Brennan briefed FBI Director Comey on his meeting with Obama, including the Clinton Plan Intelligence. Therefore, when Comey approved the opening of Crossfire Hurricane on July 31, based on a "suggestion" of a "suggestion" of Russia colluding with Trump, he was aware

---

And damn this feels momentous. Because this matters. The other one did, too, bu[t] that was to ensure we didn't F something up. This matters because this MATTERS. So super glad to be on this voyage with you.

[5] *See supra* n.2. Compare this with the FBI's attitude toward the Clinton email investigation, which overlapped Crossfire Hurricane in time and personnel. Page warned Strzok in February 2016 not to go into his interview of Clinton "loaded for bear" because "she might be our next president." Just as they were getting ready to officially open Crossfire Hurricane, Page expresses on July 30 how difficult it will be to "ramp up for testimony on [Clinton investigation] in the fall [because] none of us are going to care at all anymore."

of the intelligence that Hillary Clinton planned to spread these very rumors. The CIA briefed other members of the Crossfire Hurricane team on the Clinton Plan Intelligence on September 2, and even sent Comey and Strzok a formal Investigative Referral Memo about it on September 7. These were all ignored.

43.    The Clinton plan, which can be traced back as early as February 26, 2016,[6] involved two major prongs. For the first prong, Clinton campaign attorneys at Perkins Coie hired Fusion GPS (in April 2016), which in turn hired Christopher Steele (in May 2016), to compile "intelligence reports" on Trump-Russia collusion (the "Steele Dossier"). For the second prong, the law firm also hired an IT executive and a team of IT researchers (also in May 2016) who created a white paper alleging that DNS data showed a "back channel" of communication between Trump and Vladamir Putin through Alfa Bank servers. Both the Steele Dossier reports and the Alfa Bank data fell apart under the most basic of scrutiny, but the FBI not only ignored these problems, it actively concealed them.

44.    For example, the Steele Dossier reports, which were being fed to the FBI as early as July 5, 2016, contained basic, verifiable errors and self-

---

[6] On February 26, 2016, Joel Johnson, senior advisor to Bill Clinton, emails Jennifer Palmieri, Director of Communications for Hillary Clinton, regarding "Trump swift boat project." He asks, "Who is in charge of the Trump swift boat project? Needs to be ready, funded and unleashed when we decide—but not a half assed scramble." Palmieri responded, "Gee. Thanks, Joel. We thought we could half-ass it. Let's discuss." Swift boating is, of course, a political term of art—derived from the Swift Boat Veterans for Truth attack ads against John Kerry in 2004—which refers to a dishonest, personal, and unfair political smear.

contradictions that should have called them into question immediately. The timing of the reports and their contents showed that they were made-to-order by the Clinton campaign, looking backward at publicly available information and then recasting it as part of the Russia collusion conspiracy. The FBI also knew that Christopher Steele was being paid by the Clinton campaign, a fact that it utterly discounted in and even concealed from the FISC when it sought FISA warrants on Carter Page. Upon learning the identity of Steele's "primary sub-source," Igor Danchenko, in December 2016, the FBI found out that Danchenko lived in Northern Virginia, not Russia, as previously represented, and that he was a nobody, with no significant connections in Russian government.

45.     Moreover, once the FBI interviewed Danchenko on January 24, 2017, it found out that he had no corroborating evidence, his allegations involved "rumor and speculation," he directly disputed information attributed to him by Steele as inaccurate and misleading, and his alleged primary source, Sergei Millian, was someone he had never met or spoken to. Rather than discount the Steele Dossier reports for the Clinton-funded fiction that they were, and close the investigation, the FBI *hired* Danchenko as a Confidential Human Source, which had the effect of protecting his identity and prolonging the FBI's ability to keep the pretextual Crossfire Hurricane investigation open.

46.    Notably, the FBI had relied on Danchenko's information from the Steele Dossier to obtain and renew a Foreign Intelligence Surveillance Act ("FISA") warrant from the Foreign Intelligence Surveillance Court ("FISC") on Carter Page. The FISC issued the original FISA warrant on October 21, 2016, and renewed it on January 12, 2017. Not only did the FBI fail to immediately disclose the confessions of Danchenko to the FISC that would have undermined their probable cause, but in a gross violation of ethical duties, it renewed its applications to the FISC two more times based on the exact same, knowingly false information—on April 7 and June 29. This, of course, was not the only time the FBI lied to or misled the FISC on its Page warrant applications. For each of the FISA warrants, the FBI misleadingly concealed the fact that the Steele Dossier was funded by the Democrat party and/or the Clinton campaign to provide dirt on Donald J. Trump and his campaign, and failed to disclose the obviously relevant Clinton Plan Intelligence. And in the final renewal, the FBI deliberately altered an email to conceal the fact that Carter page had been providing information to the CIA as a source.

47.    The FBI knew that if it fully disclosed to the FISC that Steele was being paid by the Clinton Campaign, or if they disclosed the Clinton Plan Intelligence, it would completely undermine their showing of probable cause, and they would not have received any warrant. Absent the FISA warrant,

issued in October 2016, Crossfire Hurricane, and all its sub-investigations would have collapsed.

48.    Meanwhile, despite these glaring problems with the Steele Dossier, FBI leadership, including Comey and McCabe, were fighting with other agencies in the intelligence community to *include* the Steele Dossier reports in the upcoming Intelligence Community Assessment on Russian interference in the 2016 election ("ICA"), requested by President Obama on December 9, 2016,[7] and completed on January 6, 2017. Unsurprisingly, Comey won this battle, and a summary of the Steele Dossier allegations was included as an appendix to the ICA. Comey then deftly used this as a weapon against incoming President Trump. Up to that point, the Steele Dossier allegations had gotten little traction in the press, likely because the reports were so facially ludicrous that even the most scandal-happy journalists did not want to risk their reputation republishing them. However, once the allegations were included in the ICA, Comey had an excuse to brief them to Trump and other

---

[7] President Obama's request for the ICA was itself playing into the Clinton Plan Intelligence by embedding the idea of Russian collusion into the minds of the public, the press, and the intelligence community, and served as cover for the ongoing investigation of President Trump and justification for why the FBI could withhold information about the investigation from the incoming administration. To a similar end, President Obama held a secret press briefing with "progressive journalists" on January 17, 2017, during which he repeatedly emphasized the Russia collusion narrative. He embedded it in the minds of those journalists and cultivated the Russia collusion hoax by suggesting President Trump had secret communications with Putin through business intermediaries and received Russian paybacks in return, and he encouraged the journalists to amplify such stories which were entirely speculative.

senior leaders in Congress. The news of this briefing was promptly leaked, likely by Comey himself,[8] which led to the allegations being validated and gave cover to the press to publish about them.

49.     The Alfa Bank story collapsed even faster than the Steele Dossier and is similarly revealing of the FBI's extreme prejudice against Trump and the dishonest means by which it kept Crossfire Hurricane open. Clinton attorney Michaell Sussmann presented the Alfa Bank data directly to FBI General Counsel James Baker and Bill Priestap on September 19, 2016. Priestap's notes from that day show that he knew Sussmann was working for "DNC, Clinton Foundation, etc."[9] They turned the data over to a cybercrime specialist at the Washington, D.C. office who, within hours, was able to determine that it was useless at best and fraudulent at worst. Instead of bringing Sussmann in for questioning, FBI leadership removed the cybercrime specialist from the case and transferred it to the Chicago office under a "close hold," which hid the source of the data from the newly assigned agents and falsely told them that the referral came from DOJ. Again, this had the effect of prolonging the investigation.

---

[8] Comey did the same later, when he leaked his own notes on conversations with President Trump to engineer the appointment of Mueller as Special Counsel.

[9] Not that the FBI should have needed a warning from the CIA to be suspicious of "intelligence" provided by a political campaign against its rival, but this was well after the CIA investigative referral memo on the Clinton Plan Intelligence, and Priestap's own notes from September 2, 2016, show that he was aware of the Clinton Plan Intelligence.

50.    This hopelessly biased political attitude about Trump and Crossfire Hurricane reflected the top-down ethos at the FBI. As Comey later wrote in an op-ed in *The New York Times*, he believed Trump was "morally unfit to be President" and "he eats your soul in small bites." Comey admitted he made careful notes of every conversation and communication he had with President Trump, something he never did as FBI Director with President Obama, and a practice he illegally weaponized against President Trump. Comey's double standard for President Trump and President Obama, not to mention for then presidential candidates Trump and Hillary Clinton, was more than obvious. Equally harmful, FBI leadership and the vast majority of hand-picked agents and employees responsible for the Trump-Russia investigation subscribed to the same double standard. Whether intentionally with political malice or accepting without any self-awareness or independent neutral review of the facts, this double-standard permeated and infected Crossfire Hurricane and Crossfire Razor from the top down, and from the beginning to end.

### FBI Opens Crossfire Razor Investigation of General Flynn without Legitimate Investigative Predicate

51.    The Crossfire Razor investigation of General Flynn was a sub-investigation within the Crossfire Hurricane umbrella, opened a few weeks later, on August 16, 2016. Crossfire Razor stemmed from Crossfire Hurricane,

contained many of the same personnel, and involved the same investigative strategy and issues.

52.    Leaving aside the lack of probable cause and other manifest deficiencies of the umbrella Crossfire Hurricane investigation, the Crossfire Razor sub-investigation itself lacked a legitimate investigative predicate. The FBI's reported justifications for opening Crossfire Razor were (i) General Flynn's position as advisor to presidential candidate Donald J. Trump; (ii) "open source" reporting on General Flynn's "ties to various state-affiliated entities of the Russian Federation"; (iii) the fact that General Flynn had traveled to Moscow where he famously sat at a table with Vladimir Putin; and (iv) that General Flynn has a top secret/sensitive compartmented information ("TS/SCI") clearance. Exhibit C.

53.    Based on the FBI's draft closing communication, these purported justifications—in isolation and in combination—reveal the baseless and malicious nature of the investigation. Moreover, they were in violation of the FBI's own policies, which prohibit the investigation of a U.S. citizen solely for the purpose of monitoring activities protected by the First Amendment or the lawful exercise of other rights secured by the Constitution or laws of the United States, and require a factual investigative predicate.

54.    An FBI predicated investigation may be opened if a criminal action or threat to national security has or may have occurred, will be occurring, or is

occurring, or if a target is or may be the object of an attack, victimization, acquisition, or recruitment in connection with such actions and the predicated investigation would protect against such threat. To open a preliminary predicated investigation, there must be an allegation of a violation of the above. Based on publicly available information, the FBI's apparent predicate is incredible.

55.     General Flynn's status as an advisor to a presidential candidate is not a proper justification to investigate him as a Russian spy. General Flynn is a widely respected three-star general, recognized as one of the United States' greatest intelligence officers. Unsurprisingly, he was sought out by and advised multiple presidential candidates prior to joining the Trump campaign. Again, as discussed, there was no credible information to investigate Donald Trump as a Russian spy, so affiliation with President Trump—a First Amendment protected activity—was not a legitimate basis for investigation.

56.     The supposed "ties" to "state-affiliated entities," apparently amounted to speaking fees that General Flynn received as part of his speaking circuit after leaving government service. As the FBI was well aware, speaking fees are common for high-level military personnel after they leave government service. General Flynn appeared at over two dozen events after leaving government service, all arranged by his speaking bureau, not by him personally, and all were lawful exercises of his First Amendment rights.

57.     Among General Flynn's many speeches, given at corporate events for many companies, the supposed "ties" apparently amounted to three appearances. One was at a U.S.-based subsidiary of a Russian company. Another was at a U.S. company that happened to be owned by a Russian. The third was his appearance on a panel at a RT gala in Russia, where he sat at a table with Russian President Vladimir Putin. The fact that a notable retired general was invited to speak at these events was not unusual, the fees received were not unusual, and there was nothing specific about any of these appearances or speeches that was improper. These "ties" could be found with any number of retired, high-level government officials, and did not warrant investigating General Flynn as a Russian asset.

58.     General Flynn's attendance of the RT gala in Russia is even less of a basis for investigation than already discussed. As the FBI was fully aware— yet conscientiously omitted from its closing memo—General Flynn briefed the U.S. government before and after the RT trip. Therefore, General Flynn was acting as an information-gathering agent for the United States, not for Russia. The inclusion of this trip (twice) as a justification for investigating General Flynn as a Russian spy was facially incredible. Making it even more incredible, is the fact, known to the FBI, that Vladimir Putin did not actually sit with General Flynn for an extended period of time, instead appearing briefly to address the attendees, posing for photos, and leaving.

59.    General Flynn's possession of TS/SCI clearance, one of the highest levels of security clearance, was a reason *not* to suspect General Flynn as a Russian spy. TS/SCI clearance holders undergo rigorous background investigations and polygraph examinations. In other words, General Flynn's TS/SCI clearance meant that he had already been thoroughly vetted by the U.S. government and was subject to ongoing investigation and polygraph examination to maintain his clearance. The FBI was fully aware at the time of opening Crossfire Razor that General Flynn had undergone a complete background investigation in spring of 2015, which included a full scope polygraph examination. The FBI's inclusion of General Flynn's TS/SCI clearance as a justification for investigating him was also facially incredible.

60.    Even in combination, these factors could not possibly have formed a proper factual predicate for investigation. It would require the FBI to fantasize that a three-star general had betrayed his country on the basis of a few thousand dollars in speaking fees—a bare fraction of what generals make on the speaking circuit—and his position as foreign policy advisor to presidential candidate Donald J. Trump. This was incredible.

61.    The real reason for Crossfire Razor was part of the "insurance policy" discussed by FBI agents Strzok and Page the day before Crossfire Razor was opened. Exhibit B.

**FBI Executive Leadership Micromanaged and Compartmentalized Information to Deliberately Manipulate the Department of Justice and FBI Case Agents**

62.    The Crossfire Hurricane investigation was marked by deliberate compartmentalization of information and intentional delays orchestrated by the FBI's highest levels, particularly its executive management (the "7th floor"). This approach restricted information flow, limited oversight, and hindered thorough analysis, seemingly to control the investigation's narrative and outcome.

63.    FBI executive leadership failed to share critical Clinton Plan Intelligence with Office of Intelligence (OI) attorneys or the FISC, despite relying on uncorroborated Steele Reports, which were tied to the Clinton campaign. This omission obscured bias in Steele's reporting, a fact not disclosed in FISA applications targeting Carter Page.

64.    FBI leadership, including Director Comey and Deputy Director McCabe, exerted unusual involvement, pressuring OI attorneys to expedite FISA applications while delaying or denying investigative steps, such as interviewing Page or Papadopoulos or opening a case on Charles Dolan, a former Democratic operative. Decisions to deny case openings lacked clear rationale, with some agents speculating political motivations.

65.    The investigation was run from FBI Headquarters and designated as a "prohibited" case file in Sentinel—a rare designation, requiring the

highest level of authority which could only have come from Comey and/or McCabe. Sentinel is the FBI's electronic case management system. Designating a case as "prohibited" allows agents to hide the existence of relevant investigative reports from other authorized users of the federal database.

66.    Unlike other restricted designations, where a search would return a result indicating the existence of documents requiring a higher level of clearance, "Prohibited Access" documents return a null result, or a false negative result, indicating that there are no documents responsive to the query. Therefore, exculpatory documents showing General Flynn's innocence, part of the "Prohibited Access" case, were concealed, and SCO attorneys, who were under extreme pressure to obtain a successful prosecution did so without having or disclosing key documents.

67.    Thus, team members operated with incomplete information, hampering coordination between intelligence and operational components. This structure limited oversight and shielded the investigation from broader FBI scrutiny.

68.    Exculpatory documents and statements were misinterpreted or withheld from OI attorneys and the FISC, only to be disclosed years later. Similarly, the FBI did not pursue logical investigative steps, such as vetting

Clinton Plan Intelligence or investigating Dolan's role in the Steele Reports, despite concerns about their political origins.

69.    The failure to vet partisan materials, combined with the suppression of critical intelligence and rushed investigative decisions, is evidence of a deliberate effort by FBI leadership to control the investigation's direction.

**FBI Continues Crossfire Razor Even After Clearing General Flynn**

70.    Even ignoring the previously discussed problems with opening the Crossfire Hurricane *and* Crossfire Razor investigations, and assuming for argument that these investigations could have been opened in good faith, the FBI wrongfully and maliciously chose to continue Crossfire Razor even after it had completed its investigation and cleared General Flynn of any improper ties to Russia.

71.    William Barnett, the lead FBI agent assigned to Crossfire Razor, was unable to find any evidence of criminal activity, and he was able to determine that the one potential lead was uncorroborated and implausible. Barnett repeatedly requested permission to interview General Flynn and close the case unless derogatory information was obtained. He was rebuffed on the grounds that an interview would tip off General Flynn, which he didn't understand, given that there was so far no derogatory information or evidence

of a crime, and an interview would likely be the last step before closing the case.

72.    Crossfire Razor dragged on and was delayed by FBI leadership, who declined interview requests, and vacillated on whether to allow National Security Letters (NSLs) to pull phone records. With no derogatory information and no movement, some of the agents assigned to Crossfire Razor were eager to close the case as early as November 8, 2016.

73.    Other agents and analysts on Crossfire Razor, however, were zealots in their Berian belief that they would find a crime. Those included Strzok and Pientka.

74.    Finally, in late-December 2016, after multiple requests, and even threatening to perform no further investigative work on Crossfire Razor, Barnett was given the go-ahead to close it, but without any interview of General Flynn and no NSLs, which would have been standard "check-the-box" investigative steps before closing a full investigation. Barnett drafted a closing memorandum that specified "[p]er the direction of FBI management, [General Flynn] was not interviewed as part of the case closing procedure." Exhibit C. It described the specific goal and predication for the investigation and laid out the numerous searches of holdings and investigative steps that had, at each step, yielded no derogatory information.

75.    The closing communication stated that the FBI's Crossfire Razor investigation had failed to produce any information upon which to predicate further investigative efforts regarding General Flynn. And it noted that no interview of General Flynn was warranted before concluding that the FBI was closing the investigation. Exhibit C.

76.    The closing memorandum had not been implemented, however, as of January 4, 2017. At some point before that date, but after the closing memo had already been drafted, FBI senior staff obtained a transcript of a December 29, 2016 phone call between General Flynn and Russian Ambassador Kislyak. How the FBI obtained this transcript is unclear, as it is illegal to monitor the communications of Americans without a warrant. Kislyak's calls were undoubtedly monitored by NSA, but General Flynn's identity should have been "masked," as further discussed below, and there were no "unmasking" requests made between December 29 and January 4. It is likely that General Flynn's call with Kislyak was improperly obtained or that his identity was never masked.

77.    Regardless, the FBI had the transcript, and they knew or should have known that the communications were legitimate. Indeed, lead agent Barnett read the transcripts on January 4, 2017, multiple times, and did not find them to be problematic.

78.    Knowing that the counterintelligence investigation of General Flynn was slated to be closed, FBI leadership considered opening a new criminal investigation based solely on a potential violation of the Logan Act, 18 U.S.C. § 953. Discussions with the DOJ, however, resulted in the general view that the Logan Act was not viable, and the FBI never opened an independent FBI criminal investigation. This is unsurprising, as the Logan Act is a relic of the John Adams Administration, the dubious constitutionality of which has never been tested because it has never been successfully prosecuted. Therefore, FBI leadership determined to continue its Crossfire Razor counterintelligence investigation of General Flynn on the sole basis of the non-criminal and non-problematic Kislyak calls.

79.    On January 4, 2017, Strzok urgently reached out to another FBI agent, demanding to know if the Crossfire Razor investigation had been closed, as previously intended, and if not, *ordering* that it remain open due to interest from the 7th floor—meaning top FBI leadership. It had not been closed. Relieved, Strzok immediately relayed the news to Page, remarking that "our utter incompetence actually helps us" and calling it a "serendipitously" good development. Exhibit D at 5.

80.    The reason that Strzok was so relieved at this serendipitous incompetence, is that he knew there was no legitimate grounds for opening another investigation into General Flynn. The FBI cannot simply investigate

38

an incoming NSA because he communicated with a foreign leader; it is common during the transition to a new administration. Moreover, Strzok, McCabe, and Comey were fully aware that Flynn's statements to Kislyak were perfectly appropriate diplomatic talks, which sought to—and apparently succeeded in— persuading Russia not to take drastic retaliatory steps against the United States in response to President Obama's recent expulsion of Russian diplomats.

81.    It is only because of Defendant's agents' malicious, partisan, and unethical intent to investigate their political opponents generally and to destroy General Flynn specifically that senior officials and political leadership of the FBI and DOJ continued the Crossfire Razor investigation.

82.    Strzok instructed agents to keep the investigation open at the behest of FBI leadership. Therefore, as of January 4, 2017, the FBI kept open its counterintelligence investigation into General Flynn based solely on his calls with Kislyak—the only new information to arise since the FBI's determination to close the case—calls which they knew to be legitimate.

## Defendant's Improper and Malicious Motivations for Investigating and Prosecuting General Flynn

83.    On or about November 10, 2016, only two days after the presidential election, President-elect Trump met with President Obama in the Oval Office. During this meeting, President Obama singled out General Flynn,

warning President-elect Trump against appointing him to any high-level national security positions. President Obama made this statement despite himself having appointed General Flynn to the position of Director of the Defense Intelligence Agency in 2012.

84.    President-elect Trump ignored that advice. On or about November 18, 2016, General Flynn accepted the once-in-a-lifetime honor of becoming the next National Security Advisor.

85.    The Obama White House held special contempt for General Flynn. As the *Associated Press* reported, "Of all the [sic] Trump's choices, White House officials said it was the selection of Flynn that felt like the most devastating blow." NPR also reported, "Flynn clashed with President Barack Obama's White House about how the U.S. was waging its wars." General Flynn had publicly lambasted President Obama for not being aggressive enough with Iran, for lying to the American public, and for politicizing intelligence. President Obama took the criticism personally, particularly when General Flynn was proven right on the threat posed by ISIS.

86.    Top brass at the FBI also had reason to resent General Flynn. In 2012, a decorated counterintelligence agent at the FBI filed an EEOC complaint for sexual discrimination and retaliation, which implicated McCabe. General Flynn, who had worked closely with this agent, wrote a letter vouching

40

for her in 2014 and volunteered to be a witness for her case. The FBI fought to prevent General Flynn from being a witness in this EEOC case.

87.    These issues—while they provide background on Defendant's vindictiveness and would be grounds enough to establish the calculated malice directed at General Flynn in their wrongful prosecution and abuse of process—are a side-show to the bigger, and truly despicable motivations at play in the U.S. Government's targeting of a U.S. citizen and decorated three-star general for destruction and disgrace.

88.    General Flynn was the only senior member of President Trump's incoming administration—not subject to Senate confirmation—with experience in the intelligence community: the same intelligence community that had colluded with Clinton Campaign operatives to create the Russia-collusion hoax; the same intelligence community that had been spying on the Trump campaign; the same intelligence community that intended to *continue* its spurious Crossfire Hurricane "investigation" into President Trump's supposed Russian collusion. General Flynn—who already had a reputation as a hands-on disruptor at DIA, who had publicly excoriated the politicization of the intelligence community, and who had made clear his desire to overhaul the national security structure and the "interagency process"—was a direct threat, not only to the self-interest of entrenched intelligence bureaucracies and the

41

federal officials involved, but to exposing their prior and ongoing efforts to derail and discredit President Trump.

89.    Defendant's agents were acutely aware that General Flynn was one of few people in the Trump White House with the authority and the intelligence background to uncover and expose the Crossfire Hurricane debacle.

90.    The Executive Office of the President (EOP), DOJ, and FBI, under President Obama, were so distraught by General Flynn's selection as NSA that they calculatingly, and with actual malice and corrupt motives, conspired to and did use the tremendous power of their positions to investigate, entrap, and prosecute General Flynn. Defendant's agents executed these actions knowingly, purposely, and in complete disregard of General Flynn's constitutional and other legal rights.

91.    One of the ways Defendant did so was to target General Flynn by "unmasking." The National Security Agency (NSA) routinely captures communications among and between foreigners, and while it is not supposed to collect communications of Americans, it often does so incidentally. When it does, the NSA "masks," or redacts their identity, and only "unmasks" it when there is a specific request, made by an authorized person, for a valid foreign-intelligence purpose. In other words, the NSA can reveal an American's identity in monitored communications to certain government officials if it is

required to understand the significance of the communication. These unmasking requests are highly unusual, but they shot up almost immediately after the 2016 election results were in.

92.    On November 30, 2016—almost a month prior to General Flynn's Kislyak call—U.S. Ambassador to the United Nations, Samantha Power, requested the first of many illegal unmasking requests targeting General Flynn. Power made a total of seven requests to unmask General Flynn. In fact, from November 2016 through January 2017, Obama officials made 49 total unmasking requests targeting General Flynn. Included in those requesters were FBI Director Comey, CIA Director Brennan, Director for National Intelligence James Clapper, multiple top-level officials at the Treasury Department, Chief of Staff to President Obama, Denis McDonough, and Vice President Joe Biden himself. Almost all of these requests were prior to General Flynn's December 28, 2016 call with Kislyak.

93.    Another way Defendant targeted General Flynn was to prevent closure of the Crossfire Razor investigation, even though it had already determined that General Flynn had no ties to Russia. As discussed, on January 4, 2017, the FBI, in coordination with the EOP, chose to extend the Crossfire Razor investigation on the pretext of the legitimate Kislyak calls.

94.    The next day, January 5, 2017, Comey and McCabe met in the Oval Office with President Obama, Vice President Biden, Deputy Attorney

General Sally Yates (then, the acting Attorney General), CIA Director Brennan, ODNI Director James Clapper, and National Security Advisor Susan Rice.

95.    During this meeting, the participants agreed to try to damage incoming President Trump and his new administration, including by trying to prosecute General Flynn, to force General Flynn to resign as NSA, and cripple President Trump's ability to implement national security and foreign affairs policy changes, and potentially turn General Flynn against President Trump. They also agreed to withhold this agreement from President-elect Trump's transition team.

96.    Withholding information about the Crossfire Hurricane investigation from the incoming administration was a paramount goal, as documented by Susan Rice in her infamous CYA memo about this meeting, which she wrote to herself on January 20, 2017: "President Obama said he wants to be sure that, as we engage with the incoming team, we are mindful to ascertain if there is *any reason that we cannot share information fully as it relates to Russia*" (emphasis added).

97.    Immediately after that meeting, President Obama asked that Yates and Comey stay back for a private meeting, in which Obama and Comey spoke knowingly about the Flynn-Kislyak calls, discussed the Logan Act, and indicated the President's special interest in General Flynn.

98.    Tellingly, that was the day, January 5, 2017, that President Obama's chief of staff made an unmasking request to NSA targeting General Flynn.

### Defendant Plans Perjury Trap for General Flynn

99.    On January 4, 2017, after having read the Kislyak transcripts, Barnett, as the lead case agent on Crossfire Razor, once again offered to interview General Flynn. Barnett, however, was not a "believer" and not part of the "get Trump" cohort within FBI leadership. Barnett was not looking to entrap General Flynn, only to gather information, and if there was nothing derogatory, to close the case. For that reason, Barnett was cut out of any further discussions surrounding an interview of General Flynn.

100.    Between the Oval Office meeting on January 5, 2017, and January 24, 2017, Comey and Yates met to discuss the General Flynn matter, and thereafter Comey and McCabe discussed and developed a specific plan to interview Flynn about alleged Russian influence.

101.    On or about January 10, 2017, another Oval Office meeting took place involving a discussion of the Crossfire Razor investigation and General Flynn. According to notes taken by Strzok, during this meeting, the group agreed that General Flynn's actions were "legit." A common shorthand for legitimate.

102.  At or around that time, an unnamed "senior U.S. government official" feloniously leaked details about General Flynn's phone call with Kislyak to *The Washington Post*, which published about it on January 12, 2017, speculating about a possible Logan Act violation.[10] In a follow-up piece, *The Washington Post* reported that *nine* officials "who were in senior positions at multiple agencies" spoke anonymously, and illegally, about the Kislyak calls. Information about the calls was also leaked to *The New York Times*, whose reporting confirmed that the FBI and the Obama Administration were aware at the time of the legitimate nature of the communications:

> Obama officials asked the F.B.I. if a quid pro quo had been discussed on the call, and the answer came back no, according to one of the officials, who like others asked not to be named discussing delicate communications. The topic of sanctions came up, they were told, but there was no deal.[11]

103.  Despite the consensus that General Flynn's actions, including the Kislyak calls, were legitimate, Vice President Biden suggested a potential prosecution of General Flynn under the Logan Act. The DOJ, however, indicated in subsequent meetings that such a prosecution would be unlikely to

---

[10] David Ignatius, *Why did Obama dawdle on Russia's hacking?*, THE WASHINGTON POST (Jan. 12, 2017), https://www.washingtonpost.com/opinions/why-did-obama-dawdle-on-russias-hacking/2017/01/12/75f878a0-d90c-11e6-9a36-1d296534b31e_story.html.

[11] Peter Baker, *Flynn's Downfall Sprang From 'Eroding Level of Trust'*, THE NEW YORK TIMES (Feb. 14, 2017), https://www.nytimes.com/2017/02/14/us/politics/fbi-interviewed-mike-flynn.html.

succeed, especially since no prosecution has ever occurred pursuant to the Logan Act.

104.    This, however, did not stop the high-level leakers from suggesting this possibility to the media, who breathlessly repeated the potential for a Logan Act violation. Importantly, the FBI would later use these leaks, and the media's discussion of the Logan Act, as a justification for not putting the White House or DOJ on notice prior to sending agents to "interview" General Flynn.

105.    FBI Director Comey decided that the FBI would not notify the incoming Trump Administration of the actual contents of the Flynn-Kislyak communications, despite possessing the transcripts. Deputy Attorney General Sally Yates and other senior DOJ officials, however, were of the opposite opinion and believed that the incoming administration should be notified.

106.    Comey's reasoning for not disclosing the information to the Trump Administration changed several times to the chagrin of DOJ leadership. The Deputy Attorney General, Director of National Intelligence, and Director of the Central Intelligence Agency all agreed that the FBI should notify the Trump Administration of what had actually been said on the calls.

107.    In the interim, Strzok and Page sought advice from an FBI attorney regarding a potential interview of General Flynn. On January 22, 2017, an FBI attorney emailed Strzok and Page to state that if the FBI would

usually tell the White House about the interview of someone such as General Flynn, then the FBI should do what the FBI would normally do.

108.   Per the internal discussions of the FBI leading up to the interview of General Flynn, however, they believed that any notification to the White House or DOJ leadership about the interview or its purpose would surely result in a denial of permission to conduct the interview. At the very least, it would result in General Flynn being accompanied by White House counsel. In either case, their goal would be thwarted.

109.   The goal was to ambush General Flynn with a perjury trap to remove him as an obstacle to the continuing Crossfire Hurricane investigation and as a threat to their own jobs and the entrenched intelligence apparatus. Additionally, a high-profile conviction of General Flynn, even for a manufactured process crime, would serve as a post-hoc validation and prolonging of the baseless Crossfire Hurricane investigation.

110.   At an FBI meeting held on the morning of January 24, 2017, Priestap expressed second thoughts about the perjury trap. In his hand-written (and heavily redacted) notes from that day, he describes having previously agreed with the plan to not show General Flynn [redacted, but likely, the transcripts of the Kislyak calls]. He asks, however, whether the FBI's goal in this case is to get the truth, or to "get [Flynn] to lie, so we can prosecute him or get him fired?" Priestap recognized the grave danger these

48

kind of "games"—as he diplomatically calls them—posed to the credibility of the FBI as an institution. His warnings were ignored. Exhibit E.

111.   By apparent happenstance, Sally Yates attempted to contact Comey that same day, January 24, 2017, to demand that the FBI notify the White House of the Kislyak communications. Perhaps unsurprisingly, she was unable to get through. Comey waited until Strzok and Pientka were already en route to the White House before calling Yates back to tell her that it was too late, advising her that FBI agents were already on their way to interview General Flynn.

112.   Yates described being "flabbergasted" and "dumbfounded" by Comey's actions, and other DOJ leadership "hit the roof" upon hearing of this development, as any interview of General Flynn should have been coordinated with at least the DOJ and the White House Counsel's Office.

113.   Comey had determined that the FBI would interview General Flynn without notifying anyone at either the DOJ or the White House Counsel's Office. During a December 2018 publicly televised interview with MSNBC and NBC News analyst Nicolle Wallace, Comey glibly admitted—indeed, bragged—that sending FBI agents to the White House to interrogate a senior official without notice, was something he probably wouldn't have done or gotten away with in a more organized administration. Comey admitted that he took an improper course of conduct in continuing the investigation and

ordering the interview of General Flynn, and that he got away with it because it was "early enough" in the administration that he could take advantage of the disorder. But for this interview of General Flynn, there would have been no criminal charges brought against General Flynn.

114.    On January 24, 2017, McCabe called General Flynn requesting a meeting, to which Flynn agreed, not knowing he was being set up. During this call, McCabe told General Flynn that he wanted the interview done "as quickly, quietly, and discreetly as possible," and then advised that if General Flynn wished to have anyone else at the meeting, including the White House Counsel, the FBI would have to elevate the issue to the DOJ. Such a comment was designed by the Deputy FBI Director to get the target of an investigation to speak with federal agents without any counsel present. McCabe further downplayed the need for counsel by telling General Flynn that this was an informal meeting, just to put the Kislyak calls being discussed in the press to bed.

115.    Later that same day, FBI counterintelligence agents Strzok and Pientka interviewed General Flynn at his office in the White House. Neither agent informed General Flynn prior to or during this meeting that his statements could, and likely would, be used against him in a criminal prosecution. Neither of them informed General Flynn that he was the subject of an investigation. The agents acted casual and friendly toward General

Flynn, never putting him on notice of the dire consequences of any misstatement he might make, however innocent or immaterial.

116.   During this interview, Strzok and Pientka were attempting to trap General Flynn in a misstatement or omission so that they could charge him with a false statement violation of 18 U.S.C. § 1001. This malicious intent continued throughout the FBI's investigation and their continued involvement in and influence exerted over the investigation and prosecution by the Special Counsel's office. Exhibit D at 8 n.2.

117.   Despite this intent, neither of the FBI agents ever warned General Flynn about the possible penalties involved with misstatements, omissions, or lies to an FBI agent. Reports indicate that whether to give General Flynn such a § 1001 warning was specifically discussed amongst FBI leadership prior to General Flynn's interview, but FBI leadership did not want to tip off General Flynn to the true purpose of the interview. They wanted him fully at ease and without legal counsel.

118.   The intentional decisions by FBI leadership to manipulate General Flynn to have the interview without counsel and not to warn him of the potential penalties emphasize the malicious nature of the improperly continued Crossfire Razor investigation into General Flynn.

119.   Additionally, prior to the interview, the FBI engaged in internal discussions about whether to show General Flynn the transcripts of his calls with Kislyak.

120.   Because the FBI already had these transcripts, General Flynn's answers during an interview would have shed no light on whether and what he communicated with Kislyak. Due, at least in part, to these highly unusual and deliberately irregular procedures, the DOJ ultimately admitted—as indeed it had no choice but to admit—that it could not explain, much less prove to a jury beyond a reasonable doubt, how the allegedly false interview statements by General Flynn could be "material" to an investigation that—as explained above—was continued with the purpose of eliciting those false statements and to thereby entrap General Flynn.

121.   Because the FBI possessed the transcripts, the only explanation for not providing them to General Flynn during the interview—as was standard protocol—was that the purpose of the interview was not to get to the truth (which they knew) but to trap General Flynn in a misstatement or omission, as indicated by Bill Priestap that very morning.

122.   General Flynn's statements could not have conceivably influenced an investigation that no longer had either a legitimate counterintelligence or criminal purpose. Moreover, even if they could be material, the DOJ did not

believe it could prove that General Flynn knowingly and willfully made a false statement beyond a reasonable doubt.

123.   Tellingly, when asked by the National Security Division of the DOJ whether the FBI would like to conduct a follow-up interview with General Flynn, as would be standard protocol, McCabe emphatically said no. Sally Yates was apparently surprised by this, but the reason was obvious. McCabe did not want a follow-up interview because the mission had been accomplished. General Flynn had been neutralized and would no longer be an obstacle to continuing the Crossfire Hurricane investigation into President Trump.

124.   The White House was briefed on the supposed misstatements made by General Flynn to the FBI, and as a result, on February 13, 2017, General Flynn was forced to resign from his position as NSA. That, however, was only the beginning of the torment in store for General Flynn at the hands of Defendant's agents in their crusade to destroy President Trump and his allies.

## Defendant Initiates Prosecution of General Flynn without Any Legitimate Legal or Factual Basis

125.   Following the spurious January 24, 2017 interview, Strzok and Pientka took three weeks to submit their notes. FBI regulations, however, require notes about interviews to be submitted five days after the interview. *United States v. Harrison*, 524 F.2d 421, 425 (D.C. Cir. 1975). In the interim,

Strzok consulted with Page—with whom he was having an extra-marital affair at the time—about how to best draft the notes of the Flynn interview. FBI regulations again, however, suggest that the notes be submitted by the agent that did the interview based on their recollection and notes, not outside sources. *Id.*

126.   Despite the improper delay, and multiple revisions, the notes submitted by Strzok and Pientka did not support a prosecution of General Flynn. The notes indicated that General Flynn was unguarded in the interview and clearly viewed the agents as allies. The notes also indicated that General Flynn exhibited a very sure demeanor and did not give any indicators of deception.

127.   Both of the interviewing agents had the impression at the time that Flynn was not lying or did not think he was lying. After reviewing the case notes, FBI Director Comey even stated that there was only an *argument* to be made that General Flynn lied. Notwithstanding the impressions of the interviewing agents and FBI Director Comey himself, Comey, Strzok, and the rest of the FBI (and ultimately the rest of the Justice Department) proceeded to "investigate" further and prosecute Flynn—contrary to the facts and on the less-than-flimsy legal basis that an argument could be made Flynn lied even though they all knew it was an argument that would not stand up to scrutiny. Their only hope, then, was that no one at the FBI or rest of the Justice

Department would ever actually independently and neutrally scrutinize the false statement allegation, or even if they did would not have the courage and integrity to stand up to the false statement narrative.

128.   Despite the obvious knowledge the interview was not material to the Crossfire Razor investigation's purpose and the interviewing agents and Comey believed General Flynn either did not lie or only may have lied—and at that, unintentionally—the FBI used these doctored notes, submitted far past their deadline, to prosecute Flynn, not for any real underlying misconduct, but for allegedly lying to the FBI during the interview that the FBI completely botched according to the DOJ's own regulations.

### SCO Continues the Same Malicious Prosecution

129.   The FBI and DOJ, taking its lead from President Obama and President Obama's team, knew that with Trump unexpectedly winning the election, their malfeasance in opening Crossfire Hurricane and Crossfire Razor was in danger of being exposed. Moreover, these bad actors still wanted to "get Trump" and to continue the investigations under the new administration.

130.   President Trump's firing of Comey on May 9, 2016, presented a problem, because if the president appointed a replacement, Crossfire Hurricane would unravel, and the misdeeds of Comey and his inner circle would be exposed. In anticipation of this, Comey had been secretly taking notes about his conversations with President Trump—something he never did with

President Obama—and just as he had used the January 6, 2016 briefing to trigger a media frenzy on the ridiculous Steele Dossier allegations, he leaked his notes to the press to create a frenzy that Trump was trying to interfere with his investigation of General Flynn. Comey's stated purpose was to engineer the appointment of a Special Counsel.

131.   The appointment of Robert Mueller as special counsel on May 17, 2017,[12] was the direct result of Comey's illegal leak, and his selection—among an extremely limited number of people with the credentials to be considered for such an important post—was almost certainly influenced by Comey.

132.   Mueller's appointment resulted in the creation of the SCO within the DOJ. The SCO assumed the investigation and continued working with the same FBI officials/leadership and the same FBI investigative teams assigned to the relevant investigations.

133.   From the outset, however, objectively speaking, Mueller was neither genuinely independent from the FBI nor actually disinterested in the outcome of the Trump-Russia collusion investigation. Mueller had previously been the FBI Director for twelve years. During part of his time as FBI Director, Mueller reported to, and his boss was, Deputy Attorney General James Comey. Mueller's personal and professional reputation was largely dependent on the

---

[12] Mueller's appointment as Special Counsel was illegal from the outset. *Trump v. United States*, 603 U.S. 593, 643–50 (2024) (Thomas, J., concurring); *United States v. Trump*, 740 F. Supp. 3d 1245, 1253 (S.D. Fla. 2024).

FBI's reputation. Whether for reasons of declining mental capacity or delegation of responsibilities, or both, Mueller was not a "hands-on" boss over all aspects of the continued investigations and prosecutions. In fact, given his testimony to Congress after the release of the Mueller Report, it was evident to most observers that he was not even aware of basic facts material to the Mueller investigation and prosecutions.

134. At the same time, Mueller delegated or deferred investigatory decisions to his subordinates who were even less "independent" and "disinterested" than Mueller. Most of them could not be truthfully characterized as "politically neutral career FBI agents and DOJ prosecutors."

135. The FBI, working through the SCO, continued acting in its investigative and law enforcement capacity, in that it continued to use the same personnel and investigative tools as the FBI and had the same law enforcement powers as the FBI. The SCO retained many of the same zealots from the FBI and DOJ who had previously worked to "get Trump" and had improperly started and continued the investigation into General Flynn. For example, Strzok remained in charge of the Flynn investigation, exercising the same Berian conviction that he would be able to find a crime, while at the same time, acting for self-preservation, knowing that if the prosecution failed, he would be exposed for his misconduct. Similarly, Page carried over to SCO, continuing to serve as a conduit between Strzok and McCabe, and all three of

them were similarly exposed if Flynn was not successfully prosecuted. Other FBI agents, who were central in the Crossfire Hurricane and Crossfire Razor investigations that continued to be involved post-Mueller included Brian Auten, Joe Pientka, and Stephen Somma.

136.   From the beginning, the SCO was briefed by lead agent Barnett on his assessment of Crossfire Razor, that there was no evidence of a crime. SCO attorney Jean Rhee, however, was another "believer" in the Trump-Russia collusion theory, and completely dismissed Barnett's explanations for why General Flynn's speaking fees and speech in Russia were not evidence of a crime. Rhee shared the FBI leadership's agenda and was "obsessed with Flynn and Russia." Rhee, however, was not privy to the FBI's concealed evidence debunking the entire idea of Russia collusion. By this time, the FBI had interviewed Danchenko and knew that the Steele Dossier reports were ridiculous fabrications, paid for by the Clinton campaign, and consistent with the Clinton Plan Intelligence. The FBI had also dismantled the Alfa Bank white paper and knew that a Clinton lawyer had tried to feed them fraudulent data linking President Trump to Russia. The FBI concealed these facts, as well as the evidence of General Flynn's innocence of the § 1001 charge. Had Rhee, among many others, not been so fundamentally misled by the FBI, she might have reconsidered.

137. The SCO investigators, largely carried over from the FBI investigators interpreted (and blatantly misinterpreted) information gathered in the most negative possible manner for the targets, while disregarding any possible non-incriminating interpretation. When a person they interviewed did not provide the information they desired, SCO investigators assumed that they must be lying. Specifically, SCO investigators assumed without evidence—and because of the FBI's concealed evidence to the contrary—that General Flynn was lying to cover up collusion between President Trump and Russia.

138. McCabe and other FBI leadership, including Priestap, withheld from SCO the critical exculpatory information of the Clinton Plan Intelligence, as well as the significant exculpatory information learned over the course of the Crossfire Razor investigation. For example, Strzok's exculpatory 302 report and notes, which were not turned over to General Flynn's defense team until after the sentencing hearing, was likely because of the compartmentalized and prohibited designation.

139. The SCO, under the leadership of the FBI agents who wanted to continue the investigation improperly as they had done in the past, continued the investigation of General Flynn, despite the lack of evidence of a crime, as a means to "get Trump," and to hopefully use General Flynn as a cooperating witness against Trump.

140.   The SCO did not conduct an independent investigation but merely adopted the same improper investigation and techniques of the prior FBI-led investigation and were determined to obtain a conviction at any cost.

141.   On November 30, 2017, the FBI and SCO succeeded in procuring the filing of a criminal information against General Flynn, officially initiating a false, reckless, abusive, and malicious felony criminal prosecution against him. The information improperly charged General Flynn with one count of making false statements in violation of 18 U.S.C. § 1001(a)(2). The SCO falsely asserted in the information that General Flynn had intentionally omitted and denied speaking with Russian Ambassador Kislyak during an interview with FBI agents Strzok and Pientka on January 24, 2017.

### General Flynn Pleads Guilty after SCO Threatens his Son

142.   Before General Flynn had any inkling of Crossfire Razor, he was dealing with a seemingly routine FARA filing for his short-lived consulting firm, Flynn Intel Group (FIG). General Flynn's son, Michael G. Flynn, had been the chief of staff for FIG. General Flynn had received a letter from the DOJ in December 2016, requesting FARA filings. General Flynn hired experienced attorneys at the supposedly respectable law firm of Covington & Burling to prepare and file the requested paperwork.

143.   Unusually, the FARA unit chief at the DOJ National Security Division, Heather Hunt, personally took charge of this case and repeatedly urged General Flynn's lawyers to file the paperwork quickly. The Covington lawyer had never seen this before. DOJ counterintelligence chief, David Laufman, also got personally involved.

144.   SCO took over the FARA case, and in August 2017, General Flynn's Covington lawyers learned that the SCO was not only pursuing General Flynn for supposed crimes under the Crossfire Razor investigation, but that they were also looking into both he and his son for potential crimes involving the FARA filings.

145.   On December 1, 2017, General Flynn entered into a plea agreement, not because he thought he had done anything wrong—he hadn't— but because SCO had threatened his son—newly a father himself—with prosecution, and he was told that SCO would let his son go if he cooperated. SCO required that this side-deal be kept out of the written plea agreement and kept from the court, so that it would not look like the plea was obtained through promises or threats, when it in fact was.

146.   The SCO prosecutors who participated in this unlawful, secret deal to coerce General Flynn did so in service to the higher goal, set by the FBI at the highest levels, to procure a prosecution at any cost. Moreover, the FBI had manipulated the evidence by compartmentalizing and concealing it and it now

61

appears the SCO attorneys did not even have the whole picture. They were pursuing General Flynn under the mistaken belief that President Trump or his campaign was colluding with Russia—a belief that continued only because the FBI had buried all evidence to the contrary—and that charging Flynn with a crime, any crime, would increase pressure on President Trump. Moreover, the FBI buried the evidence of Flynn's innocence, so the SCO attorneys were also operating under the mistaken believe that their cause was righteous.

147.   At the time the information was filed, the high-level investigative and law enforcement officers of the SCO, carried over from the FBI, knew that General Flynn was innocent of any illegal contacts with any foreign power or any material misstatements to the FBI. Still, they pressured SCO attorneys to commence the prosecution of General Flynn, following the lead of FBI leadership.

148.   The FBI, through their officers and employees, with the assistance of Defendant's investigative and law enforcement officers, including but not limited to those named herein, had malicious intent when they unlawfully investigated and procured the prosecution of General Flynn despite knowing his legal innocence of the charges brought.

149.   The Defendant and its investigative and law enforcement officers, including those named herein, were all aware of the fact that General Flynn was not a Russian agent, and there was no basis for any further investigation

or initiating any prosecution. Nevertheless, the individual federal employees and officials decided to prosecute General Flynn anyway, destroy General Flynn professionally, block General Flynn from holding a position of influence in the government, and thwart President Trump's agenda.

150.  Strzok and Page had a stated motive to stop Trump at least as early as August 15, 2016, and they endeavored through their work in the Crossfire Razor investigation to procure the prosecution of General Flynn to advance that purpose. Page participated and assisted Strzok in his partisan, malicious actions. They conceived of the initial investigation into General Flynn as an insurance policy should presidential candidate Hillary Clinton lose the 2016 election. When Clinton lost the election, Strzok put this insurance policy into motion by wrongfully keeping the Crossfire Razor investigation open and interviewing General Flynn.

151.  The Defendant, by and through its investigative and law enforcement officers, knew that General Flynn's calls with Kislyak were "legit," and instead of closing the Crossfire Razor investigation, they tried to think of new, even unprecedented, ways to investigate and prosecute General Flynn.

152.  Strzok and Pientka continued to participate in the investigation and prosecution of General Flynn despite having certified that they did not

believe General Flynn intentionally lied. Intent is a necessary element of a Section 1001 conviction.

153. During the improper prosecution of General Flynn, the government willfully failed to disclose exculpatory evidence in violation of its constitutional obligations under *Brady v. Maryland,* 373 U.S. 83 (1963). The exculpatory evidence the government failed to disclose included, but is not limited to, the notes from Strzok and Pientka showing the FBI believed General Flynn did not lie during his January 24, 2017 interview, and the notes describing the Oval Office meeting wherein Comey stated General Flynn's calls with Kislyak were "legit," and wherein Vice President Biden suggested using the Logan Act as a basis for prosecuting General Flynn. The FBI possessed these documents and based on the security protocols and compartmentalization implemented at the top levels, by Comey and McCabe, this information was concealed, leading to the prosecution of General Flynn.

154. Each of these examples are plainly exculpatory, either because they directly tend to show General Flynn's innocence of the § 1001 violation, or because they indirectly tend to show his innocence by revealing the nefarious motivation behind the prosecution.

155. The Defendant, by and through its investigative and law enforcement officers, procured the prosecution of General Flynn despite knowing his factual and legal innocence and the abuse of process engaged in

during the investigation and prosecution of General Flynn. The FBI continued investigating General Flynn even when it knew that General Flynn was not a Russian agent.

156.   After General Flynn was deliberately, knowingly, maliciously, and falsely charged with the § 1001 criminal violation, the United States District Court for the District of Columbia severely limited General Flynn's liberty to travel freely within and without the United States. The District Court imposed travel restrictions on General Flynn, against his will, within the boundaries fixed by the United States and even to boundaries within the United States. As a result of General Flynn's unlawful prosecution and detention, General Flynn was unable to travel freely inside and outside of the United States.

157.   Not only was his reputation permanently stained by Defendant's unlawful investigation and prosecution, but he was unable to carry on his international consulting business personally. For the above reasons, the restrictions severely curtailing General Flynn's movements were unlawful, just as the prosecution that created General Flynn's movement restrictions was unlawful.

158.   Further, the FBI misled the FISA court to continue the Crossfire Hurricane umbrella investigation, proceeded with an investigation into General Flynn's supposed "Russian ties" when they knew he had none, and threatened his son, Michael Flynn, Jr., with prosecution unless he pled guilty

to a § 1001 offense. All of these facts and others demonstrate that Defendant acted with malice in investigating and prosecuting General Flynn.

159.   In or around February 2020, Attorney General William P. Barr appointed several independent prosecutors to review the *United States v. Flynn* case. This team included United States Attorney for the Western District of Missouri Jeff Jensen.

160.   At the conclusion of this team's review, they recommended that the case against General Flynn be dismissed. As discussed above, on May 7, 2020, the DOJ, through United States Attorney O'Shea, moved to dismiss the prosecution against General Flynn. In doing so, the DOJ stated that the government does not have a substantial federal interest in penalizing a defendant for a crime that it is not satisfied occurred or that it does not believe it can prove beyond a reasonable doubt. The DOJ motion to dismiss laid out in great detail the underlying facts and legal circumstances surrounding the unjustified and unsupported prosecutions of General Flynn and why the case should never have been brought.

161.   In sum, the DOJ admitted that the allegations against General Flynn did not even amount to a crime because even if the statements in issue were false, they were not material. Therefore, the charge inherently lacked probable cause since the statements were immaterial, materiality being a required element of the crime alleged.

162. Proof of a false statement to federal investigators under § 1001(a)(2) requires more than a lie, and the FBI and the DOJ did not believe that General Flynn had lied when the prosecution was brought. It also requires demonstrating that such a statement was material to the underlying investigation. Section 1001 prohibits "knowingly and willfully . . . mak[ing] any materially false, fictitious, or fraudulent statement or representation" in a "matter within the jurisdiction of the executive . . . branch of the Government of the United States." 18 U.S.C. § 1001.

163. Based on an extensive review of its investigation and prosecution of General Flynn, the DOJ determined that continuing the prosecution of General Flynn would not serve the interests of justice. Under the *Principles of Federal Prosecution,* the government should not prosecute an individual unless the attorney for the government believes that the admissible evidence is sufficient to obtain and sustain a guilty verdict by an unbiased trier of fact.

164. The government carries this burden regardless of any plea agreement, especially since a plea agreement can be withdrawn by a defendant at any time before sentencing. If the government relies solely on a plea agreement to bring charges, then it has failed its duty to independently determine if probable cause exists to support the charges brought.

165. In General Flynn's prosecution, the evidence showed his statements, regardless of whether any were false, were not material to any

67

viable counterintelligence investigation—or any investigation—initiated by the FBI. The FBI itself recognized that it lacked any sufficient grounds to sustain its initial counterintelligence investigation when it sought to close that very investigation without an interview of General Flynn.

166.   With its counterintelligence investigation no longer justifiably predicated, the communications between General Flynn and Kislyak—the FBI's sole basis for resurrecting the investigation on January 4, 2017—did not warrant continuing the existing counterintelligence investigation, reopening or redirecting the existing counterintelligence investigation, or opening a new criminal investigation.

167.   Notably, the FBI considered, but did not open, a criminal investigation based on General Flynn's calls with Kislyak. Indeed, the FBI never even attempted to open a new investigation of General Flynn on these grounds.

168.   In dismissing its prosecution against General Flynn, the DOJ determined that General Flynn's calls with the Russian ambassador—the only new information to arise after the FBI's decision to close out his investigation—did not constitute a sufficient articulable factual basis to re-open any counterintelligence investigation or open a criminal investigation into General Flynn.

169.   In addition to the FBI's changing justifications for the FBI's ongoing probe of General Flynn, the FBI's irregular procedure that preceded his interview also proves that in the wake of the Kislyak call, the FBI was eager to interview General Flynn irrespective of any legitimate investigative purpose. It is undisputed the FBI agents breached standard procedure of arranging interviews of White House personnel through the White House Counsel's Office and did not notify DOJ leadership or White House personnel about the interview in advance.

170.   In addition, Deputy FBI Director McCabe affirmatively and effectively discouraged General Flynn from procuring the assistance of White House or personal counsel during the interview, or even notifying the White House Counsel's Office about the interview at all.

171.   The interviewing agents also failed to issue the standard § 1001 admonitions about the consequences of false statements to investigators. Nor did the FBI even notify Acting Attorney General Yates that the interview was happening until the interviewing agents were already en route to General Flynn. Even worse, before the FBI's interviewing agents even scheduled and left for the interview, the FBI deliberately ignored a preexisting request for information about the Crossfire Razor investigation from the Acting Attorney General. In other words, FBI Director Comey knew that Acting Attorney General Yates would not approve of the interview of Flynn and deliberately

waited to inform her until it was too late to prevent the interview—a knowing, willing, and deliberate violation of the legal and political chain of command.

172.   The FBI agents, who actually interviewed General Flynn, had the impression that General Flynn was not lying or at least did not think he was lying. Moreover, the statements in question were not, by their nature, easily falsifiable. During his interview with the FBI agents, General Flynn offered either equivocal ("I don't know") or indirect responses or stated that he did not remember the matter in question.

173.   Considering the vague substance of General Flynn's answers, the FBI's estimation of General Flynn's truthfulness, the inconsistent FBI records as to the actual questions and statements made, FBI Director Comey's own sentiment that the case was, at best, a close one, and the information available to the DOJ, FBI, and the SCO at the time the government wrongdoers procured the filing of the criminal information indicated that there was not only no probable cause to support the claim that General Flynn knowingly and willingly lied to investigators during the interview, but it wasn't even close.

174.   U.S. District Court Judge Emmet Sullivan, however, refused to approve the DOJ's dismissal of its prosecution, necessitating an appeal to the D.C. Circuit Court of Appeals by General Flynn. The D.C. Circuit initially ordered Judge Sullivan to dismiss the charges and case against General Flynn in its entirety. In response, Judge Sullivan—the supposedly disinterested

judge, who mused aloud about whether the Department of Justice could charge General Flynn for treason (it could not), and who stated on the record to General Flynn that "[a]rguably, you sold your country out"—*retained counsel*, literally becoming an interested party, and petitioned for *en banc* review from the D.C. Circuit. After *en banc* review, the D.C. Circuit remanded the case to Judge Sullivan for appropriate dispatch, who continued to drag his feet on dismissal of the case.

175.   On November 25, 2020, after having suffered nearly three years of wrongful prosecution and torment by the U.S. Government, General Flynn received a presidential pardon. In a statement by the White House about the pardon, the White House stated: "General Flynn should not require a pardon. He is an innocent man.  Even the FBI agents who interviewed General Flynn did not think he was lying.  Multiple investigations have produced evidence establishing that General Flynn was the victim of partisan government officials engaged in a coordinated attempt to subvert the election of 2016."

176.   General Flynn was pardoned because the DOJ itself had found that he was innocent, and yet he was still being prosecuted. This is affirmed by the recommendation that the case be dropped upon review by outside independent prosecutors and the DOJ's own motion to dismiss the case admitting it did not believe that a crime occurred, much less one that it could prove beyond a reasonable doubt.

177.  On December 8, 2020, the criminal case against General Flynn was *finally* dismissed by Judge Sullivan in its entirety.

178.  Judge Sullivan in his dismissal colloquy could not resist taking a few parting partisan jabs at General Flynn, but he ultimately dismissed the entire criminal information filed against General Flynn.

179.  General Flynn was the target of a politically motivated FBI investigation and the DOJ and the SCO prosecution that had no merit when it began, no merit during its course, and no merit in the end when the charges were withdrawn and dismissed by the DOJ and ultimately dismissed by Judge Sullivan after General Flynn received a full presidential pardon.

180.  During that meritless and unlawful FBI investigation and the DOJ and the SCO prosecution procured by its investigative and law enforcement officers, General Flynn was falsely and maliciously painted by the Defendant as a traitor to his nation, alleging that he was engaged in illicit actions with a hostile foreign power. These malicious allegations were so pervasive and so widely disseminated in the news and in political circles, that even the sitting judge regurgitated them at General Flynn's sentencing hearing.

181.  Defendant's agents and agencies' targeting of a United States citizen for baseless counterintelligence investigation and criminal prosecution and eliciting a plea bargain through threatening family members is dangerous and outrageous conduct of the highest order. The fact that it was orchestrated

and carried out at the highest levels of the FBI, DOJ, and SCO makes it all the more outrageous. That it was done intentionally, purposefully, deliberately, and with reckless and total disregard for the rights, reputation, and position of General Flynn—the President's highest-ranking national security advisor, a retired United States Army Lieutenant General with 33 years of honorable military service to our country, and a citizen of the United States—makes Defendant's agents and agencies' conduct despicable, even by partisan Washington standards.

182.    Unsurprisingly, General Flynn has suffered greatly from the Defendant's agents and agencies' politically driven, personally motivated, baseless, and outrageous investigation and prosecution. This harm is exacerbated by the fact that General Flynn has dedicated his entire adult life to serving the United States through military service and his civilian service as the National Security Advisor to a President.

183.    The betrayal and persecution he suffered, by the country he spent decades defending and serving, has caused General Flynn severe emotional distress, as it would anyone in his position. Moreover, because of the improper, coordinated actions of the FBI and DOJ, General Flynn lost the once-in-a-lifetime and priceless honor to serve as the highest-ranking national security advisor to a President of the United States.

184.   General Flynn was injured in other ways due to the vicious, false attacks on his character, including but not limited to compensatory and financial damages, including attorney's fees and expenses, court costs and other legal expenses, reputational damages, loss of goodwill, and the loss of earnings and future earnings from his international consulting business, and the loss of earnings and future earnings resulting from being denied the opportunity to serve an entire term as the President's National Security Advisor.

185.   Overall, the harm to General Flynn has been and is immense. As a result of this unjustifiable, outrageous, and malicious prosecution of General Flynn and the abuse of process engaged in to carry it out by FBI agents, FBI leadership, Justice Department prosecutors, and the highest-ranking EOP officials in the Obama administration, punitive damages are not only warranted but essential to deter any present or future FBI, DOJ, SCO, and EOP official from harming anyone else like they harmed General Flynn. Even if punitive damages are not allowed in this case, General Flynn is entitled to be fully compensated for each and every one of his pecuniary and non-pecuniary losses resulting from Defendant's malicious and outrageous conduct against him.

## CAUSES OF ACTION

### COUNT I
### FEDERAL TORT CLAIMS ACT
### Malicious Prosecution

186.    Plaintiff incorporates by reference the above paragraphs as though set forth fully herein.

187.    The Federal Tort Claims Act provides "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

188.    Plaintiff has exhausted his administrative remedies under 28 U.S.C. § 2675 of the Federal Tort Claims Act as a prerequisite to instituting a claim against the United States for money damages for injury or loss of property or personal injury caused by the negligent or wrongful act or omission of any employee of the United States government while acting within the scope of his or her office or employment.

189.    By letter dated February 24, 2022, Plaintiff presented his administrative claim to the DOJ. The DOJ admitted that it received the claim in its offices on March 3, 2022.

190.    The DOJ has not responded within the prescribed statutory deadline to General Flynn's Form 95 submission and, therefore, General Flynn's Form 95 is, as of the filing of this Complaint, deemed denied,

exhausting General Flynn's administrative remedies and granting him the right to sue in this Court.

191.   Defendant is responsible for the actions of its investigative or law enforcement officers, or officers with supervisory authority over such officers who are investigative or law enforcement officers within the meaning of 28 U.S.C. § 2680(h). Defendant is also responsible for the actions of those named herein (1) who are officers of the United States acting functionally/substantively (as opposed to formally) in an investigative or law enforcement role or decision, or (2) who are officers of the United States not acting functionally/substantively (as opposed to formally) in a genuinely independent prosecutorial or judicial role or decision, such that they are directly influenced by and rely upon the actions of investigative or law enforcement officers of the United States within the meaning of 28 U.S.C. § 2680(h).

192.   Defendant, through its investigative and law enforcement officers maliciously investigated and procured the prosecution of General Flynn by initiating and continuing a baseless counterintelligence investigation and by filing a criminal information lacking probable cause. Defendant's acts were willful, knowing, deliberate, and malicious, as explained above.

193.   Defendant, through its investigative and law enforcement officers deliberately concealed exculpatory documents and evidence that would have

ended the umbrella Crossfire Hurricane investigation and its sub-investigations, as well as exculpatory documents and evidence that would have ended or prevented the procurement by the SCO of a prosecution of General Flynn.

194.   As a direct and proximate result of Defendant's actions, General Flynn suffered harm. He was falsely branded as a traitor to his country, lost at least tens of millions of dollars of business opportunities and future lifetime earning potential, was maliciously prosecuted and spent substantial monies in his own defense, and has suffered and will continue to suffer mental and emotional pain for the rest of his life, in addition to other pecuniary harms such as costs, fees, attorneys' fees, and other losses.

<u>COUNT II</u>
**FEDERAL TORT CLAIMS ACT**
**Abuse of Process**

195.   Plaintiff incorporates by reference the above paragraphs as though set forth fully herein.

196.   The agents and agencies named herein, for whom Defendant is responsible, abused their official positions and authority to bring process against General Flynn for an improper motive.

197.   Defendant, by and through its law enforcement and investigative agents, manipulated and pressured prosecutors to bring process against General Flynn and General Flynn's son to coerce General Flynn into pleading

guilty to a Section 1001 charge of which he was innocent, and which those law enforcement and investigative officers knew he was innocent. Defendant further sought to use process against General Flynn to coerce General Flynn into testifying against other members of the Trump administration or Trump Campaign, including President Trump, despite the process brought and the overarching investigation into President Trump and his campaign having no legitimate basis in law or fact.

198.   Defendant in fact did bring a criminal information against General Flynn and used this criminal information to coerce General Flynn into providing information against others despite the government wrongdoers knowledge that the criminal information brought lacked probable cause and was brought for an improper purpose.

199.   As a direct and proximate result of Defendant's actions, General Flynn suffered harm. He was falsely branded as a traitor to his country, lost at least tens of millions of dollars of business opportunities and future lifetime earning potential, was maliciously prosecuted and spent substantial monies in his own defense, and has suffered and will continue to suffer mental and emotional pain for the rest of his life, in addition to other pecuniary harms such as costs, fees, attorneys' fees, and other losses.

## **PRAYER FOR RELIEF**

200.   Plaintiff respectfully requests this Court enter a judgment in his favor and grant relief against the Defendant as follows:

a.  Compensatory damages in an amount to be determined at trial but expected to exceed $50,000,000.00, pursuant to Plaintiff's claims against Defendant United States of America;

b.  Reasonable attorneys' fees with respect to all of Plaintiff's causes of action against the Defendant; and

c.  Any other relief the Court deems proper.


Dated: June 30, 2025                    MICHAEL T. FLYNN
                                        *By Counsel*


                                        Respectfully submitted,

                                        */s/ Jason C. Greaves*
                                        Jason C. Greaves (FBN 1059179)
                                        Jared J. Roberts (FBN 1036550)
                                        BINNALL LAW GROUP, PLLC
                                        717 King Street, Suite 200
                                        Alexandria, Virginia 22314
                                        Phone: (703) 888-1943
                                        Fax: (703) 888-1930
                                        Email: jason@binnall.com
                                                jared@binnall.com

                                        *Counsel for Plaintiff Lt. Gen. Michael*
                                        *T. Flynn, U.S. Army (ret.)*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 30, 2025, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

*/s/ Jason C. Greaves*
Jason C. Greaves

*Counsel for Plaintiff Lt. Gen. Michael T. Flynn, U.S. Army (ret.)*